# EXHIBIT B

## DECLARATION OF BRUCE KUMMERFELDT

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

AMY ROLLS ON BEHALF OF          CIVIL ACTION NO. 2:18-CV-00188-
UDJ-KK
HER MINOR CHILD AR

                          DISTRICT JUDGE ROBERT
SUMMERHAYS

VERSUS

                  MAGISTRATE JUDGE KATHLEEN KAY

PACKAGING CORP OF AMERICA
INC AND TIMOTHY WOHLERS

## DECLARATION OF BRUCE KUMMERFELDT

I, Bruce Kummerfeldt, declare under penalty of perjury that the following statements are true and correct:

1. I am of the age of majority, am competent in all respects to make this declaration, and have personal knowledge of all matters stated herein.

2. I am the Vice President – Health and Safety Operations at Packaging Corporation of America ("PCA"). I make this declaration with personal knowledge and/or review of the books and records of PCA, including records previously belonging to Boise Packaging & Newsprint, L.L.C. ("Boise"). I possess the legal authority to make this declaration on behalf of PCA.

3. On October 25, 2013, PCA acquired Boise Inc. and its subsidiaries, which included Boise, through a stock purchase. At this time, Boise became PCA's wholly owned subsidiary and PCA obtained control of Boise and its assets, including its containerboard mill in DeRidder, Louisiana ("DeRidder Mill").

4. Immediately following the acquisition, Boise remained the title owner and designated operator of the DeRidder Mill. However, as parent and sole owner of Boise, PCA assumed the overall control and operations of Boise which included the DeRidder Mill as Boise was prepared for merger into PCA.

5. On August 18, 2014, Boise entered into an "Annual Contractor Services Agreement" with Elite Specialty Welding, LLC ("Elite"). A true and correct copy of the "Annual Contractor Services Agreement" is attached hereto as Exhibit B-1.

6. The "Annual Contractor Services Agreement" is the only such agreement between Boise/PCA and Elite, and neither Boise nor PCA have a "Master Service Agreement for Construction" with Elite.

7. In the months leading up to and on February 8, 2017, the operations of the DeRidder Mill were being conducted at the direction of PCA's management and carried out by PCA's employees and remaining Boise payroll employees.

8. Accordingly, during the months leading up to the February 2017 planned shutdown, which shutdown was ongoing on February 8, 2017, the DeRidder Mill operations were under the control and supervision of PCA's management.

9. On February 8, 2017, the DeRidder Mill operations were under the control and supervision of PCA's management.

10. On July 1, 2017, Boise's merger in to PCA was finalized through an Agreement of Merger, with PCA as the surviving entity. A true and correct copy of the Agreement of Merger between PCA and Boise is attached hereto as Exhibit B-2.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed in Lincoln Co., on the 5 day of July, 2019.
        WI

                                Bruce Kummerfeldt

4833-8422-1595.1

# EXHIBIT B-1

## ANNUAL CONTRACTOR SERVICES AGREEMENT

ANNUAL

CONTRACTOR SERVICES AGREEMENT

FOR

BOISE PACKAGING & NEWSPRINT, L.L.C.

AND

ELITE SPECIALTY WELDING, LLC

# 14-081B

{BZ Legal/299004/0015:01260862:}



EXHIBIT
B-1

INDEX

1.0  SCOPE OF WORK..................................................................................................... 1

2.0  TERM ....................................................................................................................... 1

3.0  CONTRACTOR'S COMPENSATION......................................................................... 1

    3.1  Contractor's Compensation ............................................................................. 2
    3.2  Charges for the Work ....................................................................................... 2

4.0  PAYMENT FOR WORK ............................................................................................ 4

    4.1  Payment Schedule ........................................................................................... 4
    4.2  Applications for Partial Payment ...................................................................... 4
    4.3  Recipient of Application ................................................................................... 5
    4.4  Partial Payment by Boise ................................................................................. 5
    4.5  Waiver of Lien Rights ....................................................................................... 5
    4.6  Retainage ........................................................................................................ 6
    4.7  Discounts ......................................................................................................... 6
    4.8  Application for Final Payment ........................................................................... 6
    4.9  Final Payment .................................................................................................. 7
    4.10 As-Built Drawings ............................................................................................ 7
    4.11 Vendor Purchase Orders .................................................................................. 7

5.0  CHANGE ORDERS .................................................................................................. 7

    5.1  Changes in the Work ........................................................................................ 7
    5.2  Payment for Change Orders ............................................................................. 7
    5.3  Agreement to Change Orders .......................................................................... 7
    5.4  Contractor's Obligation to Perform Change Order Work ................................... 8
    5.5  Change Orders Interpreting Drawings and Specifications ................................. 8

6.0  ACCOUNTING AND AUDIT ..................................................................................... 8

7.0  PERFORMANCE OF THE WORK ............................................................................ 9

    7.1  Working Conditions .......................................................................................... 9
    7.2  Conduct of the Work ........................................................................................ 9
    7.3  Inspection ........................................................................................................ 9
    7.4  Chemical Use ................................................................................................... 9
    7.5  Equipment and Tool Rental.............................................................................. 10

8.0  SUBCONTRACTS AND PURCHASES ..................................................................... 10

    8.1  Subcontractors ................................................................................................ 10
    8.2  Purchases of Materials .................................................................................... 10

9.0  PERMITS AND LICENSES ....................................................................................... 11

10.0 SAFETY REQUIREMENTS ...................................................................................... 11

    10.1 Fire Protection ................................................................................................. 11
    10.2 Safety Requirements........................................................................................ 11
    10.3 Emergencies .................................................................................................... 12
    10.4 Safety in Closed Vessels ................................................................................. 12
    10.5 Material Breach ................................................................................................ 12

11.0 INSURANCE ............................................................................................................ 12

    11.1 Contractor's Liability Insurance ........................................................................ 13
        11.1.1  Workers' Compensation and Employers' Liability ............................... 13
        11.1.2  General Liability ................................................................................. 13
        11.1.3  Automobile Liability ........................................................................... 13
    11.2 Insurance Certificate ....................................................................................... 13

11.3 Severability of Interests ................................................................... 13
11.4 Property Insurance ....................................................................... 14
11.5 Deductibles ............................................................................ 14

12.0 INDEMNIFICATION AND INSURANCE .................................................. 14

13.0 WARRANTY AND REMEDY ............................................................. 15

14.0 CONFIDENTIAL INFORMATION AND PATENTS ....................................... 15

14.1 Confidential Information ................................................................. 15
14.2 Patents ................................................................................ 16
14.3 Intellectual Property .................................................................... 16

15.0 TERMINATION FOR CAUSE OR CONVENIENCE ...................................... 16

15.1 Termination Upon Boise's Breach ....................................................... 16
15.2 Termination for Cause ................................................................... 17
    15.2.1   Time for Cure .................................................................. 18
15.3 Termination for Convenience ............................................................ 18
15.4 Additional Remedies .................................................................... 18

16.0 PERSONNEL ............................................................................ 18

16.1 Consultants and Jobbers ................................................................ 18
16.2 Approval of Personnel ................................................................... 18

17.0 INDEPENDENT CONTRACTOR ......................................................... 18

18.0 BOISE'S REPRESENTATIVE ............................................................ 19

19.0 PUBLICITY .............................................................................. 19

20.0 NOTICES ............................................................................... 19

21.0 ASSIGNMENT ........................................................................... 20

22.0 GOVERNING LAW ....................................................................... 20

23.0 NO OTHER AGREEMENTS .............................................................. 21

24.0 FORCE MAJEURE ....................................................................... 21

25.0 EEO CERTIFICATE ...................................................................... 21

26.0 COMPLIANCE WITH BOISE'S DRUG AND ALCOHOL POLICY ....................... 21

26.1 Compliance ............................................................................ 21
26.2 Drug and Alcohol Testing ............................................................... 22

27.0 COMPLIANCE WITH LAWS .............................................................. 22

28.0 ASBESTOS REMOVAL ................................................................... 22

29.0 SEVERABILITY .......................................................................... 23

30.0 MISCELLANEOUS ....................................................................... 24

## ANNUAL CONTRACTOR SERVICES AGREEMENT

THIS AGREEMENT is made this 18th day of August, 2014 between BOISE PACKAGING & NEWSPRINT, L.L.C. ("Boise") and ELITE SPECIALTY WELDING, LLC ("Contractor").  Boise and Contractor hereby agree as follows:

1.0   SCOPE OF WORK.

Boise anticipates that it will require the services of Contractor in connection with expansions and modifications of existing production facilities, construction of new production facilities, and/or various other construction projects ("Project").  Boise will make assignments of services to Contractor as Boise and Contractor may, from time to time, agree ("Work").  Authorization to perform Work shall be made by issuing a Purchase Order ("Purchase Order"), which Purchase Order shall specify the scope of the Work to be performed, the time for commencement and completion of such Work, and the estimated sum to be paid to Contractor for such Work.  No Purchase Order shall be binding on Boise unless signed (1) by either the Director of Engineering, the Manager of Projects, or the Staff Engineering Manager and co-signed by the Director of Material Resources, or (2) if issued by and for services at a Boise paper mill, by the Manager of Engineering and co-signed by the Manager of Purchasing at such mill, or by their authorized representatives.  The Boise facility where the Work is to be performed shall be referred to as the "Site."  The terms of this Agreement shall apply to all Work performed pursuant to Purchase Orders issued hereunder and any conflicting or additional terms and conditions on any issued Purchase Order shall have no force or effect.  The term of this Agreement shall not be changed except by the written agreement of Boise and Contractor.  This Agreement shall not be construed to constitute a commitment by Boise to request Contractor to perform any Work.  This Agreement, all Purchase Orders issued hereunder, the Change Orders, schedules, and all other documents incorporated herein shall be referred to collectively as the "Contract Documents."

2.0   TERM.

The term of this Agreement shall commence on August 18, 2014, and shall continue until terminated in accordance with Section 15.0 of this Agreement.

3.0   CONTRACTOR'S COMPENSATION.

Reimbursement of costs will be made in accordance with this contract, specifically this Section 3.0.  Examples of costs included and excluded are contained in Schedule 1.0. In the event of a conflict between the terms of this Agreement and Schedule 1.0, the provisions of this Agreement shall control.

{BZ Legal\299004\0014:00659204:}

3.1     <u>Contractor's Compensation</u>.  Boise shall pay Contractor an amount equal to the Charges for the Work as that term is hereinafter defined.  Charges for the Work are based upon Contractor's current standard rates.  In the event Contractor changes its standard rates, such rate change may only apply to this Agreement and its associated Purchase Orders if (a) Contractor provides Boise at least thirty (30) days prior written notice of Contractor's proposed rate change, and (b) both parties agree to such rate change in advance and in writing.  This Agreement is not required to be amended to reflect any such rate change.

3.2     <u>Charges for the Work</u>.  Charges for the Work authorized by each Purchase Order shall consist of the following items:

3.2.1   Actual base time charges for all personnel employed by Contractor in the performance of the Work ("Covered Labor"), will be charged through an all inclusive rate which shall be established annually. Costs covered by the inclusive rate and not reimbursed include, but are not limited to, retirement and benefit programs, employee insurance, vacations, holidays, sick leave and other leave, FICA, SUTA, FUTA and other payroll costs, workers compensation premiums and payments, insurance, overhead and profit. A listing of allowable job classifications chargeable to the Work and associated pay range for each classification is set forth in Schedule 1.0 attached hereto and made a part hereof.  Schedule 1.0 may be revised from time to time by agreement between Boise and Contractor in order to attract and maintain competent personnel.

3.2.2   Costs for the use of computers, CAD/CAM equipment and modeling for Work performed by the Contractor shall be charged in accordance with the attached Schedule 2.0 or at actual cost if such services are provided by a person or firm not affiliated with Contractor;

3.2.3   Reproduction costs of all drawings, manuals, specifications, survey photographs, and other documents required for the Work; and costs of a record set of sepias, microfilms, or similar reproducibles for Contractor's retention.  All such costs shall be at Contractor's current standard rates, as identified in the attached Schedule 2.0, or at actual costs to Contractor if prepared by others.  Alternatively, Boise may, at its sole discretion, provide reproduction equipment to Contractor to be used in connection with the Work;

3.2.4   Costs of soil investigations, tests, laboratory fees, and of any outside consultants or other outside services that have prior written approval of Boise;

3.2.5   Transportation, traveling (at lowest available coach fare), hotel and living expenses of Contractor's employees, incurred in the discharge of duties connected with the Work when the Work requires travel greater than 60 miles from Contractor's regular place of business, including upon Boise's prior written approval, use of employees' personal cars at Contractor's applicable standard rates; provided, however, that no such charge shall be made by reason of Contractor's supplying personnel to its home or permanent regional offices because of lack of expertise in such offices, except with Boise's prior written approval.  Reasonable moving, relocation,

travel, and living expenses incurred in connection with assignment of Contractor's permanent personnel to a location other than Contractor's permanent offices and move from such location at the conclusion of assignment, but only if such assignment has been approved in writing by Boise in advance;

3.2.6  Actual cost of long distance telephone service, and express delivery services, such as Federal Express or UPS, and postage incurred in connection with the Work;

3.2.7  Costs of any permits, fees, licenses, or royalties required for the Work.  Costs of any sales, use, or similar taxes or fees now or hereafter imposed by a federal, state, municipal, or other government or agency thereof.  Boise shall not be responsible for Contractor's income tax, franchise tax or business and occupation tax;

3.2.8  Premiums and brokerage fees on all bonds and insurance policies required by Boise in excess of standard bonding and insurance carried by Contractor;

3.2.9  Cost of contract employees or those services provided by third parties in Contractor's office on a temporary basis at invoiced cost plus ___n/a___ % for overhead expenses, provided such costs are approved in advance by Boise;

3.2.10  Upon prior approval by Boise, Contractor shall be reimbursed for rental of Major Equipment necessary for the Work as follows:  Contractor shall be reimbursed based on the lowest of three equipment rental bids to be obtained by Contractor.  Major Equipment means tools or equipment with a unit value in excess of $2,000.  If Contractor uses its own Major Equipment, its cost shall be deemed to be 80% of the most current published Associated Equipment Distributor's rate.

Rental charges shall begin when such equipment and vehicles are at the Site ready for use and shall continue only during such times as such equipment and vehicles are both ready for use and either needed at the Site for performance of the Work or will be so needed sufficiently soon that it is less costly to accrue charges under this subsection 3.2.10 than to move said equipment and vehicles away from and back to the Site.  Rental charges for a piece of equipment shall cease when the total rental payments relating to that equipment equal the market value of that equipment.  At such time, Boise shall have the option of taking ownership of the equipment or the equipment shall remain on site free of rental charges until the Work is completed or, if later, the date Contractor removes the equipment from the site.  Market value shall be determined and agreed to between Boise and Contractor prior to lease or rental approval;

3.2.11  All costs for the operation of and preventive maintenance upon (including fuel and lubricants) equipment rented from Contractor or any third party and used in the Work; except that Contractor shall not be reimbursed under this subsection 3.2.11 for labor charges reimbursed under subsection 3.2.1 hereof, nor for maintenance or repairs to lost or damaged equipment for which Contractor receives proceeds of insurance maintained by Contractor;

3.2.12  The invoice price of all equipment, consumables, materials, supplies (including fuel and lubricants but excluding Small Tools as defined in subsection 3.2.14.2), services, and utilities purchased or rented by Contractor on a competitive or negotiated basis in accordance with procedures to be mutually agreed upon by Boise and Contractor;

3.2.13  Costs reasonably incurred by Contractor in connection with performance of the Work and that are not set forth in this Section 3.0, provided such costs have been approved in writing by Boise's representative in advance; and

3.2.14  Charges for the Work shall not include any of the following costs, which shall be deemed included in Contractor's fee for overhead and profit:

3.2.14.1  Superintendence and executive expense at the Site or Contractor's home office.

3.2.14.2  The costs of Small Tools, which shall include expenses incurred for freight, replacement (including, without limitation, replacement due to loss or theft), maintenance, or repairs of all Small Tools used for the Work, and for the acquisition, replacement, maintenance, and repair of all safety devices and items. "Small Tools" are those tools that have an initial value of less than $2,000 but do not include items such as consumables, expendables, office machines, engineering instruments, construction equipment, or the personal tools normally supplied by craftsmen.

3.2.14.3  The costs of blocking, shoring, and scaffolding, and the expense of maintaining such.

3.2.14.4  Engineering, drafting, office, or clerical expenses.

3.2.14.5  Any other costs not specifically included in subsections 3.2.1 to 3.2.14 above.

4.0     PAYMENT FOR WORK.

4.1     Payment Schedule.  Boise shall pay Contractor for Work authorized by each Purchase Order in progress payments.  The amount of such payments shall be determined in accordance with this Section 4.0.

4.2     Applications for Partial Payment.  On or before the tenth day of each month Contractor shall submit an Application for Partial Payment for each Purchase Order to Boise.  Such Application shall cover the preceding calendar month and shall include the following:

4.2.1  A description of Work done by Contractor during the preceding month;

4.2.2   An itemization of man-hours expended on the Work during the preceding month and hourly rates applicable thereto utilizing the attached Schedule 1.0;

4.2.3   An itemization of all other Charges for the Work incurred during the preceding month, including receipts for all items above $25.00;

4.2.4   A computation of the total amount due and payable to Contractor during the period and the amount to be retained by Boise pursuant to Section 4.6 herein;

4.2.5   A statement of all sums previously paid to Contractor for that Purchase Order;

4.2.6   An itemization of any additional compensation owed Contractor pursuant to any Change Order issued under Section 5.0 hereof, including a description of the number of man-hours expended and expenses incurred on the Change Order during such period; and

4.2.7   Such other information as Boise may reasonably request.

4.3   <u>Recipient of Application</u>.  The Application for Partial Payment and all supporting documentation shall be sent or delivered to the following address:

BOISE PACKAGING & NEWSPRINT, L.L.C.
<u>Attention</u> Accounts Payable
P. O. Box 1060
DeRidder LA 70634

4.4   <u>Partial Payment by Boise</u>.  Not more than 30 days after receipt of Contractor's Application for Partial Payment, Boise shall verify that the Work claimed by Contractor has in fact been completed and upon such verification shall issue payment for such Work, less retainage as provided in subsection 4.6 below.  Neither verification nor payment by Boise shall constitute acceptance of Work or waiver of defects therein.

4.5   <u>Waiver of Lien Rights</u>.  Boise shall have the right, prior to its making any payment due to Contractor under this Agreement, to require Contractor to execute and deliver a waiver of Contractor's lien rights and to obtain and deliver a full waiver of lien rights from each subcontractor and/or materialman supplying Work or materials hereunder and covering all Work completed prior to such waiver.  The lien waivers shall be in a form substantially similar to the lien waiver set forth in Schedule 3.0.

**For Minnesota Work, the following shall apply in lieu of Section 4.5 above:**

4.5   <u>Waiver of Lien Rights</u>.  After making any payment due to Contractor under this Agreement, Boise shall have the right to require Contractor to execute and deliver a waiver of Contractor's lien rights and to obtain and deliver a full waiver of lien rights from each Subcontractor and/or materialman supplying Work or materials hereunder.  The waiver shall cover all Work completed and paid for prior to such waiver.  The line

waivers shall be in a form substantially similar to the lien waiver set forth in Schedule 5.0.

Contractor is required to pay all Subcontractors and materialmen within ten days of receipt of payment of Boise.  Failure of Contractor to make such required payment for undisputed work shall subject Contractor to an additional penalty of 1½ percent per month to each Subcontractor or materialman not paid on time.  Contractor shall enter into a written agreement with each Subcontractor that by its terms shall require each Subcontractor pay each of its subcontractors and materialmen within ten days of receipt of payment from Boise to Contractor or be subject to the interest charge of 1½ percent per month for failure to pay undisputed work on time.  The minimum monthly interest penalty payment for an unpaid balance of $100 or more is $10.  For an unpaid balance of less than $100, the actual penalty shall be due.

4.6    Retainage.  An amount equal to 5% of the total value of Work done during the period covered by the Application for Partial Payment shall be retained by Boise.  Such retainage shall be paid to Contractor upon certification of Final Completion as provided in subsection 4.9 below.  Alternatively, if a portion of the Work is fully completed and operating, Boise may, upon receipt of full lien waivers with respect to that portion of the Work, pay to Contractor that portion of the retainage that relates to the Work.

4.7    Discounts.  Prompt payment or cash discounts or other rebates received on materials purchased pursuant to the procedure established under subsection 3.2.12 hereof shall inure to Boise whether or not taken by Contractor; provided, however, that Contractor shall not be held responsible for inability to take cash or prompt payment discounts if Contractor shall not have sufficient time to receive and approve or disapprove vendor's invoices before payment thereon is due.

4.8    Application for Final Payment.  Contractor shall notify Boise upon completion of the Work and submit an Application for Final Payment.  The Application shall contain, in addition to the information described in subsection 4.2 above, (a) the amount of retainage due Contractor, (b) an affidavit that all payrolls, bills for materials and equipment, and other indebtedness connected with the Work for which Boise or the Site might in any way be responsible have been paid or otherwise satisfied, (c) a "punch list" of all items not yet completed ("punch list" items must be completed prior to Final Payment being made), and (d) any other data requested by Boise establishing payment or satisfaction of all such obligations, such as receipts, releases, and waivers of lien rights from materialmen and subcontractors. If any materialman or subcontractor refuses or fails to furnish a release or waiver required by Boise, Contractor may furnish a bond satisfactory to Boise to indemnify against any lien.  If any lien remains unsatisfied after Final Payment is made to Contractor, Contractor shall immediately upon demand refund to Boise any amount Boise may pay, in the reasonable exercise of its judgment, to discharge any such lien or to settle the claim of any subcontractor or materialman with lien right against Boise, including the amount of all costs and attorney fees incurred by Boise in defending or settling any such lien or claim.

4.9 <u>Final Payment</u>. The balance of the payment due, including retainages, shall be paid to Contractor 45 days after Final Completion of the Work. "Final Completion" shall be deemed to have occurred on the date Boise accepts the Work in writing.

4.10 <u>As-Built Drawings</u>. Boise shall have the right, prior to its making any payment due to Contractor under this Agreement, to require Contractor to prepare and deliver accurate As-Built Drawings of all Work heretofore performed by Contractor which is different from the design drawings.

4.11 <u>Vendor Purchase Orders</u>. Upon Boise's written request, Contractor shall furnish one complete set of purchase orders for all equipment ordered under this Agreement. Contractor shall require each vendor to supply a quantity of three recommended spare parts listings, three maintenance manuals, three equipment drawings, and, when required, three erector-type drawing sets.

5.0   <u>CHANGE ORDERS</u>.

5.1 <u>Changes in the Work</u>. Boise may, at any time after execution of a Purchase Order, order changes consisting of additions or deletions or other revisions to the Work. Such changes shall be ordered and performed in accordance with the procedures required by this Section 5.0 and Contractor's payment and time for completion of the Work shall be adjusted in accordance with the terms of this Section 5.0.

Except in an emergency endangering life or property, no such change shall be made by Contractor without an order in writing from Boise authorizing the change and no claim by Contractor for additional compensation or time for completion of the Work shall be valid without such order in writing.

Notwithstanding any other provision, Contractor shall be entitled to a change order for price and schedule for (a) any delay not caused by Contractor and (b) changed conditions.

5.2 <u>Payment for Change Orders</u>. Contractor shall be compensated for Work performed pursuant to a Change Order on the basis of one of the following methods listed in order of preference, at Boise's option:

5.2.1  A fixed price or unit prices agreed upon at the time the Change Order is issued; or

5.2.2  The Charges for the Work as determined pursuant to Section 3.0 hereof required by the Change Order.

5.3 <u>Agreement to Change Orders</u>. Each Change Order shall specify the method of compensation to Contractor, as set forth in Section 5.2 of Payment for Change Orders. If the Change Order provides for compensation pursuant to Section 5.2.1 of Payment for Change Orders (a fixed price Change Order), Contractor shall sign

the Change Order to indicate its agreement to the price stated in the Change Order.  All other Change Orders shall be effective upon issuance by Boise and Contractor shall keep and properly provide to Boise accurate, complete, and detailed records of the labor and materials expended and other compensated costs incurred in the performance of the Change Order so that Contractor may be compensated pursuant to the relevant provisions of Section 5.2 of Payment for Change Orders.

   5.4    Contractor's Obligation to Perform Change Order Work.    If a written Change Order specifying payment on the basis of Section 5.2.2 of this Agreement is signed by Boise and delivered to Contractor's representative, Contractor shall promptly execute the changes specified therein.  If a written Change Order specifying payment on the basis of Section 5.2.1 (fixed sum) is issued by Boise to the Contractor, the Contractor shall promptly sign such Change Order and return a copy to Boise.  However, if Contractor disagrees with the fixed sum compensation specified therein, Contractor shall state on the Change Order the amount it desires for compensation and return a copy to Boise.  Upon receipt of the Change Order from Contractor indicating that Contractor does not agree with the proposed fixed price, Boise may either accept the Contractor's counterproposal or reissue the Change Order as a Change Order subject to compensation pursuant to Section 5.2.2.  Upon agreement on the price for a fixed sum Change Order or, failing such agreement, reissue thereof in accordance with the preceding sentence, Contractor shall promptly execute the change called for in such Change Order.

   If Contractor fails to promptly respond to a fixed sum Change Order, Boise may cancel the Change Order and reissue it as a Change Order specifying compensation pursuant to Section 5.2.2.

   5.5    Change Orders Interpreting Drawings and Specifications.    If Boise and Contractor shall disagree at any time as to the requirements of any provision of the Drawings or the Specifications, they shall meet and make a good faith attempt to resolve such dispute at the level of Contractor's Superintendent and Boise's Representative designated in Section 18.0 of the Agreement.  If the parties are unable to resolve such dispute within a reasonable time period, Boise may issue a Change Order requiring Contractor to execute the Work in accordance with Boise's interpretation of the disputed Drawings or Specifications.  Compensation for such Change Order shall be determined in accordance to Section 5.2, but Boise's obligation to pay such compensation shall be contingent upon final resolution of the dispute as to the requirements of the Drawings and Specifications.  If the parties are unable to resolve such dispute prior to the thirtieth day after completion of the Work, either party may, at any time thereafter prior to the running of any applicable statute of limitations, file suit in any court of competent jurisdiction for a resolution of the dispute; provided that the scope of such litigation shall be limited to a determination of the requirements of the Drawings and Specifications.  The additional compensation, if any, to Contractor for execution of the Work in accordance with Boise's interpretation of the Drawings and Specifications shall be determined pursuant to the terms of the Change Order.

6.0    ACCOUNTING AND AUDIT.

During the course of the Work and for a period of one year after completion of the Work hereunder, Boise, its auditors, or other authorized representatives shall be afforded access at reasonable times to Contractor's accounting records, receipts, vouchers, and other records relating to the Work in order to audit all expenses relating to the Work. Boise shall also have access to copies of audit reports, if any, that are prepared at Boise's expense.

If such an audit of Contractor's records indicates Boise has overpaid or underpaid Contractor, then the amounts shall be adjusted with interest at 10% per annum.

## 7.0   PERFORMANCE OF THE WORK.

7.1   Working Conditions.  Prior to beginning the Work pursuant to a Purchase Order, Contractor shall inspect the Site and become familiar with all working conditions which exist there.  Contractor shall make due allowance for such conditions in the estimate of time for completion and the calculation of Contractor's compensation, and hereby accepts the physical condition of the Site at the time of such inspection. Contractor will, before performing any excavation work on Boise property, call the appropriate utility centers for excavation.  Failure to properly notify can result in fines plus damages, of which Contractor is responsible.

7.2   Conduct of the Work.  Contractor shall diligently perform the Work, providing sufficient manpower, materials, and other supplies at all times to assure completion of the Work in an orderly fashion by the completion date specified in the Purchase Order.  Contractor shall provide for receipt, unloading, storage, and protection of all materials for the Work whether such materials are purchased by Contractor or Boise.  Risk of loss for materials purchased by Contractor shall remain with Contractor until their incorporation into the Work.  Contractor shall at all times keep the Site reasonably neat and clean and upon completion shall remove and dispose of all rubbish, trash, and refuse from the Work and leave the Site broom clean.  Contractor shall at all times coordinate its Work and cooperate with the forces of other contractors at the Site and with Boise's own forces.

7.3   Inspection.  Boise shall have the right at all times during performance of the Work to conduct such tests and inspections as it deems necessary both at the Site and at any prefabrication site to assure Contractor's compliance with the Contract Documents.  Boise shall have the right to use any diagnostic tool to ensure the Work meets the specifications.  If any Work or materials are found not to be in compliance with the Contract Documents, Boise shall have the right to order such Work redone in conformance with the Contract Documents.  No payment by Boise of any sums due Contractor shall be interpreted as a waiver of any defect in labor or materials.

7.4   Chemical Use.  If the Work requires the use of any chemicals, Contractor shall provide a material safety data sheet (MSDS) prior to bringing such chemicals on Site.  Upon completion of the Work, Contractor is responsible for removing all residual chemicals from the Site.

7.5   Equipment and Tool Rental. The provisions of this section 7.5 apply only to the extent that Boise leases equipment or tools ("Equipment") owned by Boise to Contractor for its use in performing its Work.

Boise hereby leases to Contractor, and Contractor hereby hires from Boise, the Equipment described in check-in and check-out receipts utilized by the parties to evidence Contractor's receipt and return of the Equipment, which receipts are incorporated by this reference, for the express purpose of performing its Work under this Agreement ("Rental"). Contractor shall, at its sole cost, pick up the Equipment from, and return the Equipment to, the location designated by Boise.

The Equipment is rented AS IS and WITH ALL FAULTS. In the event that Contractor hires an operator for the Equipment, Contractor shall exercise due care in hiring said operator and shall allow only qualified operators to operate the Equipment. Boise will not charge Contractor rent for Contractor's use of the Equipment, provided that Contractor, at its own expense, provide all maintenance and repairs necessary to keep said equipment in as good a condition as delivered, reasonable wear and tear excepted. To the extent that Contractor neglects to perform such necessary maintenance and repairs, Boise will perform the required actions and Contractor will reimburse Boise for this cost.

Contractor shall bear all risk of loss or damage to Equipment during the term of this Rental. The provisions of this Agreement, including insurance and indemnity provisions, shall apply to this section 7.5 and any use of Boise's equipment, regardless of whether equipment check-in and check-out procedures are utilized. Boise shall not be obligated to rent any Equipment to Contractor, and may terminate Contractor's right to use any Equipment at any time.

8.0   SUBCONTRACTS AND PURCHASES.

8.1   Subcontractors. Contractor shall not subcontract any portion of the Work without the prior written consent of Boise. Contractor shall require any subcontractor to carry and to name Boise as an additional insured on insurance policies having the same coverage and limitations as those described in Section 11.0 hereof and to indemnify Boise to the same extent as required by Section 12.0 hereof, provided that such indemnity shall be limited to items growing out of or connected with that portion of the Work covered by said subcontract. Contractor shall be fully responsible to Boise for the acts of all subcontractors as if such subcontractors were employees of Contractor.

8.2   Purchases of Materials. Unless otherwise stated in a Purchase Order, Contractor shall directly purchase any materials required for performing the Work. Boise and Contractor may agree in writing that for certain transactions the purchasing and subcontracting of specified construction materials, including process equipment, will be undertaken by Contractor as agent for Boise. In that event, all third parties with whom Contractor deals shall accept the terms and conditions of Boise's contract, standard purchase order, acknowledgment, and/or subcontractor forms. Title to any items so purchased or subcontracted shall pass directly to Boise.

9.0   <u>PERMITS AND LICENSES</u>.

Contractor shall obtain any contractor's licenses necessary for performance of the Work, and shall obtain or cause to be obtained all other permits and licenses required for the Work unless otherwise specified in the Scope of Work, the applicable Purchase Order, or Change Order.

10.0   <u>SAFETY REQUIREMENTS</u>.

10.1   <u>Fire Protection</u>.  Contractor shall provide and maintain approved fire extinguishers and other fire protection items in kind and number required by governing codes, laws, and/or rules of local fire departments and Boise's fire insurance carrier.

Gasoline, benzene, kerosene, and other inflammables shall not be used at the Site except as authorized by Boise and then shall be used in accordance with all applicable safety rules that may be promulgated by Boise at its sole discretion.

Lighting of fires is forbidden on or about the Site, except as authorized in writing by and within the limits set for the purpose by Boise.

Open flame cutting and welding shall be subject to such rules and regulations as may be issued by Boise at its sole discretion.  Where cutting and welding are required in areas designated by Boise as requiring a "burning permit," Contractor must obtain such permit prior to commencing the Work and shall provide adequate fireguard and fulfill all other requirements specified by Boise's regulations.

Notwithstanding any other provision of this subsection 10.1, and without limiting any of the foregoing requirements, Contractor shall exercise extreme care to avoid and prevent hazards of fire.

10.2   <u>Safety Requirements</u>.  Contractor and all subcontractors, consultants, materialmen, and jobbers for any part of the Work shall not require any person involved in the performance of the Work to work in surroundings or under working conditions that are unsanitary, hazardous, or dangerous to his or her health or safety.  Contractor shall comply with all applicable federal, state, and local statutes, rules of law, ordinances, regulations, or regulatory orders relating to safety and sanitary conditions including but not limited to the Occupational Safety and Health Act (OSHA) regulations, all established safety rules and practices of Boise, and the "Safety and Engineering Practices" as set forth in the latest edition of "Manual of Accident Prevention in Construction" as published by the Associated General Contractors of America. Contractor shall designate a responsible member of its organization on the Work as a Safety Engineer who shall be responsible for the safe operations of Contractor, its subcontractors, consultants, materialmen, and jobbers.

Prior to beginning the Work, Contractor's Safety Engineer shall consult with Boise's Safety Director at the Site and shall obtain and peruse Boise's safety procedures manual.  Contractor must comply with all rules and regulations set forth by Boise's Safety Director.

Contractor shall provide competent first aid personnel, facilities, and supplies.  All personnel shall wear safety hats.  Contractor shall provide and properly maintain warning signs, lights, barricades, railing, and other safeguards for the Work as required.  Contractor shall advise Boise in writing of the occurrence, nature, and circumstances of any injury to Contractor, its agents, employees, or subcontractors related to the performance of the Work.  Notification shall be delivered within 48 hours of the time of the injury.

Contractor shall take all necessary precautions to prevent damage to any construction work, building materials, equipment, temporary field offices, storage sheds, and all other property, both public and private.

Contractor's superintendent shall inspect the area where Work is being performed at least once a week to ensure that the safety conditions and requirements set forth herein are followed.  Boise shall have the right to make such unscheduled inspections as it may deem necessary to ensure that the Work is being performed in compliance with this Section and without unnecessary or unreasonable risks to Boise's employees.  Such inspections shall not be construed as assuring the safety of such employees or of Contractor's own employees.

10.3   Emergencies.  If any condition shall arise that endangers or threatens to endanger the safety of any person, the Work, or any property adjacent to the Work, Contractor shall immediately take all necessary steps to relieve such condition, including, but not limited to, stoppage of the Work where necessary.

10.4   Safety in Closed Vessels.  Before allowing any employee of Contractor or of any subcontractor to enter any closed vessel or confined space, Contractor shall determine whether there is an adequate and safe oxygen supply sufficient to permit safe work in the vessel.  Contractor shall also determine that the atmosphere within the vessel or space is free from poisonous, noxious, or explosive gases.  Contractor shall supply, at its own expense, (i) all equipment required to analyze or test the atmosphere within the vessel or space, (ii) oxygen-supply equipment, and (iii) masks, tanks, and like equipment necessary to ensure the safety of all employees of Contractor entering such vessel or space.  While working in the vessel, Contractor shall continuously monitor the atmosphere within the vessel.  Contractor shall comply with all OSHA and other state and federal safety regulatory requirements and take safety precautions and respond in an emergency related to one of Contractor's employees.  Contractor shall provide appropriate training and safety equipment so as to be prepared to respond to emergencies.  Although Boise may make available Boise's safety equipment or personnel, Boise does not thereby assume any responsibility for the safety of Contractor's employees or make any representations regarding the safety of Boise's personnel or equipment.

10.5   Material Breach.  Contractor's failure to comply with the requirements of this Section 10.0 shall constitute a material breach of this Agreement.

11.0   INSURANCE.

11.1   Contractor's Liability Insurance.  During the performance of the Work, Contractor, at its cost and expense, shall purchase and maintain the insurance set forth in this subsection 11.1 and Section 12.0 of this Agreement.  The insurance shall be purchased and maintained in companies acceptable to Boise and shall be primary with no right of contribution.

11.1.1  Workers' Compensation and Employers' Liability.  Workers' Compensation insurance shall be provided as required by the law(s) of the state(s) in which the Work is to be performed.

11.1.2  General Liability.  Contractor shall maintain a Commercial General Liability (Occurrence) policy, which policy shall include coverage for premises and operations, products and completed operations, contractual liability, broad form property damage, including completed operations, explosion, collapse and underground hazards, and personal injury liability.  The policy shall have a combined single limit for bodily injury and property damage of not less than $5,000,000 each occurrence; not less than $5,000,000 for personal injury liability; not less than $5,000,000 aggregate for products/completed operations; and not less than $5,000,000 general aggregate.

11.1.3  Automobile Liability.  Contractor shall maintain an Automobile Liability policy with a combined single limit for bodily injury and property damage of not less than $2,000,000 for each accident.  The policy shall cover all owned, hired, and nonowned automobiles used in the performance of the Work.

11.2   Insurance Certificate.  Contractor shall not begin Work until certificates from Contractor's insurers evidencing the above-referenced coverages have been delivered to Boise's designated recipient and:

11.2.1  Except for the coverage provided pursuant to subsection 11.1.1, shall name Boise, its subsidiaries, affiliates, directors, officers, and employees as additional insureds with respect to liability or any claims of liability arising out of the Work performed by Contractor.  Such coverage shall be provided to Boise utilizing insurance Form B (Form CG 20 10).  The parties intend this provision to be an express waiver of immunity under any applicable Workers' Compensation laws;

11.2.2  Shall provide on its face that the policies it represents will not be terminated, amended, or allowed to expire without 30 days' prior written notice to Boise; and

11.2.3  Failure of Boise to demand such certificate or other evidence of full compliance with these insurance requirements or failure of Boise to identify a deficiency from evidence that is provided shall not be construed as a waiver of contractor's obligation to maintain such insurance.

11.3   Severability of Interests.    The policies referenced in subsections 11.1.2 and 11.1.3 shall contain a severability of interests clause, generally providing, "the

insurance afforded applies separately to each insured against whom claim is made or suit is brought, except with respect to the limits of the company's liability."

     **11.4**   Property Insurance.  During the performance of the Work, Contractor shall procure and maintain fire and extended coverage property damage insurance covering the full insurable value of all of the tools and equipment used in the performance of the Work, whether located at the Site or at some other location.  Contractor shall also require its subcontractors to carry such insurance.  Contractor hereby waives any and all rights that it might have against Boise to recover all or part of any loss or damage insured or insurable by the insurance policies carried or required to be carried by it pursuant to the Contract Documents.  Contractor shall require subcontractors and sub-subcontractors to provide similar waivers each in favor of all other parties enumerated in this section 11.0.

     **11.5**   Deductibles.  Contractor may purchase the above required insurance policies with such reasonable deductibles as it may elect; provided that losses not covered by reason of such deductibles shall be for the account of the party purchasing such policy.

**12.0**   INDEMNIFICATION AND INSURANCE.

The parties intend that, to the full extent permitted by law, one party be responsible, directly and/or by and through the insurance coverage carried by such party pursuant to the provisions of the Contract Documents, for each loss, damage, or injury arising from or relating to the Work.  In furtherance of this intent:

Contractor shall indemnify, save, and hold Boise harmless from and against any and all loss, damage, expense (including attorneys fees), responsibility, liability for injury or death of persons, and/or loss, damage to, or destruction of property belonging to Boise or others, or for claims therefor, whether or not Boise has suffered actual loss, damage, or expense ("Loss"), where such Loss has resulted from, pertains to, or has arisen out of, Contractor's performance of the Work.  Contractor's indemnity obligation shall apply to any negligent acts, omissions to act, or willful misconduct, whether active or passive, on the part of Contractor, and shall extend to claims asserted after termination of this Agreement.  Contractor's indemnity obligations shall extend to the fullest extent permitted by law to the joint or concurrent negligence of Contractor and Boise, but shall not extend to Losses caused by Boise's sole negligence or willful misconduct.  Contractor's indemnity obligations shall extend to all attorneys' fees incurred in establishing Boise's right to indemnification.

This indemnity shall extend, without limitation, to the personal injury and/or death of Boise's and Contractor's employees and employees of Contractor's agents, assigns, or subcontractors.  To the extent necessary to indemnify and hold harmless Boise here-under, Contractor expressly waives any immunity or exemption from liability for the personal injury or death of Contractor's employees and that may exist under, or any right of indemnity or subrogation from or against Boise created by, the workers' compensation laws of the state where the Work is performed.  As used in this indemnity, acts referred to as being those of Boise or Contractor, as the case may be,

shall include acts of each such party's directors, officers, employees, agents, representatives, subcontractors, or assigns.  Except for claims of Loss caused by Boise's sole negligence or willful misconduct, Contractor shall assume and pay the defense costs of any lawsuit or administrative proceeding brought against Boise upon any claim of Loss and pay on behalf of Boise the amount of any settlement that may be reached on behalf of, or judgment that may be entered against, Boise in connection therewith.

The parties intend that any such loss, damage, expense, responsibility, and/or liability for injury or death, and/or loss, damage, or destruction, to which the foregoing indemnity does not, either by its terms or by operation of law, extend, shall nonetheless be compensated by and to the extent of the insurance coverage purchased or required to be purchased pursuant to the Contract Documents.  In the event that any of the provisions of this section or any other provisions of the Contract Documents shall be invalid, illegal, or unenforceable in any respect, the validity of the remaining provisions contained in this section and the Contract Documents shall be in no way affected, prejudiced, or disturbed thereby.

Notwithstanding any other provision, each party waives against the other party any and all claims for incidental, consequential and punitive damages including but not limited to loss of profits, loss of production, or loss of use.  The release and waiver shall be applicable in any action whether based on contract, negligence (either sole or concurrent), and strict liability or other tort, statute, or otherwise and to the extent permitted by law, but shall not apply to third party claims for personal injury or death.  In no event shall Contractor's liability for property damage of Owner exceed those amounts recoverable by the applicable insurance policies of Contractor."

13.0   WARRANTY AND REMEDY.

Contractor warrants that the Work performed and equipment and material supplied pursuant to the Work shall be of first quality, in full compliance with the requirements of the Contract Documents, and free from defects in design, materials, and workmanship for a period of 12 months from initial operations of the facility or equipment that is the subject of the Work.  Contractor warrants that none of the equipment or materials to be supplied under this Agreement contain asbestos or asbestos-containing materials or, if such items do contain asbestos, Contractor shall advise Boise in writing of the equipment or materials containing the asbestos.  Boise shall then advise Contractor in writing whether such equipment or materials will be acceptable.  If any aspect of the above warranty shall be breached, Contractor shall, upon receipt of notice thereof from Boise and at Contractor's sole cost and expense, promptly repair or replace the defective equipment and/or material (including labor and freight), or pay Boise the costs and expenses incurred by Boise in conducting such repair and replacement (including labor costs of Boise employees and freight).

14.0   CONFIDENTIAL INFORMATION AND PATENTS.

14.1   Confidential Information.  Contractor shall treat as confidential all data and information furnished by Boise that may be of a proprietary nature, and Contractor shall

not knowingly divulge the same to third parties without Boise's prior written consent until such data and information have become public knowledge.  If revelation of such information to third parties such as materialmen or subcontractors is necessary to assure proper execution of the Work, Contractor shall require such third parties to hold such information in strictest confidence.

     14.2   Patents.  Contractor warrants and represents that the equipment and the manufacture, sale, and use thereof do not infringe, directly or indirectly, any patent, copyright, trademark, or proprietary information right.  Contractor, at its cost and expense, shall defend, indemnify, and hold harmless Boise for all damages and costs, including all attorneys' fees and reasonable amounts paid in settlement, from any claim, demand, proceeding, or action based on any allegation that the equipment, or any part thereof, or the sale or use thereof, infringes, directly or indirectly, any patent, trademark, copyright, or proprietary information right; provided that Boise promptly notifies Contractor of such allegation and gives Contractor such authority to defend the same (at Contractor's expense).  Boise will give reasonable information and assistance for such defense but reserves the right to participate in such defense at its own expense, and Contractor will fully advise Boise in advance of all actions taken in such defense.  If the manufacture, sale, or use of the equipment, or any part thereof, is held to constitute infringement, Contractor, in addition, shall promptly, at no cost to Boise:

     14.2.1  Procure for Boise and its customers the necessary license under such patent, trademark, copyright, or proprietary information right;

     14.2.2  Replace the same with noninfringing equipment satisfactory to Boise; or

     14.2.3  Modify it in a manner satisfactory to Boise so as to eliminate such infringement.

     14.3   Intellectual Property.  All proprietary rights, including but not limited to patent rights, trade secret rights, copyrights and design rights, in ideas, inventions, designs, drawings, specifications and other information ("Intellectual Property") created, conceived, invented, developed or authored by Contractor, alone or jointly with others, in connection with performance of or arising from the Work, shall be and remain the sole and exclusive property of Boise.

     Contractor shall promptly upon its creation, conception, development, invention or authorship, as applicable, fully disclose in writing to Boise each item of Intellectual Property, and upon Boise's request shall execute all such documents as Boise may request to perfect proprietary rights to such Intellectual Property in Boise.

15.0   TERMINATION FOR CAUSE OR CONVENIENCE.

     15.1   Termination Upon Boise's Breach.  If Boise shall fail to make any undisputed payment due to Contractor pursuant to the Contract Documents for a period of 30 days after it is due or otherwise breaches its material obligations under the Contract Documents, and if Contractor is not in breach as defined in subsection 15.2

below, Contractor shall have the right to stop the Work and give Boise notice of default. If Boise fails to make payment of all undisputed sums due when due or to otherwise cure its material breach within ten days of its receipt of such notice, Contractor may terminate this Agreement by written notice to Boise, remove all its tools and equipment from the Site, and pursue such damage remedies as may be allowed by relevant law.

15.2   Termination for Cause.   If Contractor files a petition for bankruptcy; makes a general assignment for the benefit of creditors, or if a receiver is appointed on account of Contractor's insolvency; or if Contractor suspends the operations of a substantial portion of its business, or if Boise reasonably believes Contractor is financially unable to successfully complete the Work, or if Boise deems itself insecure for some other reason; or if Contractor fails to perform the Work diligently or to supply sufficient quantities of skilled labor, equipment, and materials to complete the various segments of the Work on schedule; or if Contractor fails to make prompt payment to its materialmen, subcontractors, and jobbers; or if Contractor assigns this Agreement or the whole or any part of the Work without the prior written approval of Boise, or otherwise breaches its material obligations under the Contract Documents, and Contractor does not cure such breach within the time specified in subsection 15.2.1 below, Boise may, at its option, do one or more of the following:

(a)   Demand Contractor give Boise adequate assurances that it can successfully complete the Work.

(b)   Order Contractor to stop the Work until the default is cured, in which event no adjustments in the time allowed for completion shall be permitted.

(c)   Halt all payments to Contractor until such default is cured.

(d)   Cure the default itself (using Boise employees and/or other contractors) and withhold the cost from sums currently or subsequently due Contractor.

(e)   Terminate the Agreement by written notice to Contractor and take such steps as may be necessary to complete the Work. If so directed by Boise as a result of an event described in this subsection 15.2, Contractor shall promptly remove its personnel from the Site leaving its tools and equipment for use by Boise in completing the Work. If Contractor is being paid by a fixed sum arrangement, the following shall apply upon Boise's completing the Work: If Boise's costs incurred in completing the Work when added to the total of all progress payments previously made to Contractor, plus other claims, exceed the fixed sum agreed upon by the parties, as adjusted by any Change Orders, Boise may recover the difference from Contractor. If Boise's cost of completing the Work plus all previous payments to Contractor, plus other claims, is less than the fixed sum agreed upon by the parties, as adjusted by any Change Orders, Boise shall pay such difference to Contractor within 30 days of completion of the Work, or upon receipt of Contractor's waiver of lien rights, whichever last occurs. If Contractor is being paid on the basis of the Charges for the Work, then Contractor shall recover from Boise Contractor's reasonable Charges for the Work incurred to the date of termination, less other claims, less all payments previously made by Boise to Contractor.

15.2.1 <u>Time for Cure</u>.  Except as otherwise provided in this subsection 15.2.1, Contractor shall have ten days from its receipt of written notice from Boise that Contractor is in breach of a material obligation under the Contract Documents to cure such breach.  Boise may immediately take one or more of the actions outlined in subsection 15.2(a-e) above, without allowing Contractor any period during which to cure its breach if, at the time Boise gives Contractor written notice of breach, such breach is of a nature (1) that cannot be cured within ten days or (2) that renders Contractor's full and timely performance of all of its obligations under the Contract Documents impossible.

15.3    <u>Termination for Convenience</u>.  Boise shall have the right and option at all times during the Work to terminate this Agreement without cause.  Such termination shall be effective upon delivery to Contractor of written notice of Boise's intention to terminate pursuant to this subsection 15.3.  Within 45 days of such termination, Boise shall pay Contractor in accordance with Section 3.2, less any payments previously made to Contractor.

15.4    <u>Additional Remedies</u>.  The remedies granted to the parties in this Section 15.0 shall be in addition to any remedies either party may have for breach of this Agreement pursuant to other provisions of this Agreement or relevant law.

16.0    <u>PERSONNEL</u>.

16.1    <u>Consultants and Jobbers</u>.  Contractor may employ outside consultants or retain outside services required in the performance of the Work.  In addition, Contractor may as necessary retain jobbers (temporary employees hired under contract) to assist with the Work.  No more than 5% of the personnel assigned to the Work in any discipline or design department shall consist of jobbers.  Contractor shall be obligated to assure that the insurance coverage required under this Agreement is obtained as to any consultants and jobbers hired to perform Work under this Agreement.

16.2    <u>Approval of Personnel</u>.  All of Contractor's employees, outside consultants, and jobbers assigned to the Work shall be competent to perform their services and shall be subject to Boise's prior approval.  Boise, at any time, may revoke its approval of any employee, consultant, or jobber who is not performing in a manner satisfactory to Boise, and Contractor shall remove such objectionable personnel from the Work and replace them with personnel acceptable to Boise.

17.0    <u>INDEPENDENT CONTRACTOR</u>.

Contractor's relationship with Boise shall in all respects be that of an independent contractor.  Boise shall have no power to determine or control Contractor's manner of performing the Work except insofar as may be necessary to allow Boise to properly inspect the Work and ensure itself that Contractor is complying with the Contract Documents.

**[For Louisiana Work Only, the following shall apply:**

The Louisiana Legislature passed legislation on June 5, 1997, Act 315, which requires contracts to recite in writing the "statutory employer" status of the parties hereto.  The Governor signed the legislation on June 17, 1997, and it became effective on that date (the "Act").  Boise (as principal employer under the Act) and the Contractor (as direct employer) mutually agree that it is their intention to recognize Boise as the statutory employer of the Contractor's employees under the Act while Contractor's employees are providing work and/or services to Boise under this Agreement.  The parties agree that Boise is a statutory employer only for purposes of the above-referenced Act.]

18.0   <u>BOISE'S REPRESENTATIVE</u>.

Boise's Representative is Dana Hall, or such other person designated by Boise from time to time ("Representative"), who shall have all authority to administer this Agreement.

19.0   <u>PUBLICITY</u>.

Contractor shall not publish any information or promulgate any news release concerning the Project or the performance of the Work hereunder without Boise's prior written approval.

20.0   <u>NOTICES</u>.

Any notice or demand required or permitted to be given under the terms of this Agreement shall be deemed to have been duly given or made if given by any of the following methods:

   20.1   Deposited in the United States mail, in a sealed envelope, postage prepaid, by certified mail, return receipt requested, or hand delivered, respectively addressed as follows:

|  |  |
|---|---|
| To Boise: | BOISE PACKAGING & NEWSPRINT, L.L.C. |
|  | <u>Attention</u> Dana Hall |
|  | P. O. Box 1060 |
|  | DeRidder LA 70634 |
|  | Facsimile Number 337/462-4305 |
|  | Telephone Number 337/462/4134 |

| Copy of Insurance Certificate, as required by Section 11.2, to: | BOISE PACKAGING & NEWSPRINT, L.L.C. Attention Manager, Contracts and Materials 1111 West Jefferson Street P.O. Box 50 Boise, ID 83728-0001 |
| With a copy to: | Boise Paper Holdings, L.L.C. Attention General Counsel 1111 West Jefferson Street, Suite 200 P.O. Box 990050 Boise, ID 83799-0050 |
| To Contractor: | ELITE SPECIALTY WELDING, LLC Attention Bart Maple_____ 19291 Lake Charles Hwy_____ DeRidder, LA 70634_____ Fax 337.463.2800 _____ Phone 337.462.8008_____ |
| With a copy to: | ELITE SPECIALTY WELDING, LLC Attention: Neil Moyer_____ 1411 Preston Ave_____ Pasadena, TX 77503_____ |

20.2   Sent to the above address via an established national overnight delivery service (such as Federal Express), charges prepaid; or

20.3   Sent via any electronic communications method, provided the sender obtains written confirmation of receipt of the communication by the electronic communication equipment at the office of the addressee listed above; provided also that, if this method is used, the party shall immediately follow such notice with a second notice in one of the methods set forth in subsections 20.1 or 20.2 above.

Notices shall be effective on the day sent.

21.0   ASSIGNMENT.

Without the prior written consent of Boise, Contractor shall not assign this Agreement or any part thereof. Any such consent shall not relieve Contractor from full responsibility and liability for the due performance of all of the terms and conditions hereof. If such consent is given, Contractor shall remain fully responsible to Boise for acts and omissions of Contractor's assignee and Contractor shall save Boise harmless from any and all losses and expenses caused thereby. Any attempted assignment without Boise's consent shall be void.

22.0   GOVERNING LAW.

{BZ Legal/299004/0015:01260862:}                    -20-

This Agreement shall be governed and construed according to the laws of the state in which the Site is located.

23.0   NO OTHER AGREEMENTS.

All negotiations, proposals, and agreements prior to the date of this Agreement are merged herein and superseded hereby, there being no agreements, warranties, or understandings other than those written or specified herein, unless otherwise provided. This Agreement constitutes the entire understanding between the parties with respect to the subject matter hereof.  No changes, modifications, or amendments to this Agreement shall be valid unless agreed to by the parties in writing and signed by their authorized representatives.

24.0   FORCE MAJEURE.

Any delays in or failure of performance by Boise or Contractor shall not constitute default hereunder if and to the extent such delays or failures of performance are caused by occurrences beyond the control of Boise or Contractor, as the case may be, including but not limited to:  Acts of God or the public enemy; expropriation or confiscation of facilities; compliance with any order or request of any governmental authority; act of war, rebellion, sabotage, or damage resulting therefrom; fires, floods, earthquake, unusually severe weather for the general locality of the area (the time for performance under this Agreement includes an allowance for calendar days which, according to historical NOAA Meteorological Data, may not be suitable for construction work), explosion, accidents; riots, strikes, labor disputes, or other concerted acts of workers, whether direct or indirect; or any causes, whether or not of the same class or kind as those specifically above named, that are not within the control of Boise or Contractor and that by the exercise of reasonable diligence Boise or Contractor are unable to prevent.

25.0   EEO CERTIFICATE.

Boise enters into substantial contracts with the United States Government.  Federal law requires that if the contract sum is in excess of $50,000, Contractor shall execute and deliver to Boise a certificate identical in form and substance to the EEO Certificate attached as Schedule 4.0.  Contractor's execution of this Agreement shall constitute execution of the EEO Certificate and shall bind and obligate Contractor to perform the requirements of the EEO Certificate as fully as if separately executed by Contractor.  If required by Boise for use in any compliance review conducted by any agency of the United States Government, Contractor shall, upon notice from Boise, deliver a fully executed original copy of the EEO Certificate dated as of the date of execution of this Agreement to Boise.

26.0   COMPLIANCE WITH BOISE'S DRUG AND ALCOHOL POLICY.

26.1   Compliance.  Contractor shall not permit its employees to possess or use alcoholic beverages on the Site.  Contractor shall not permit any of its employees to report to work when consumption of any alcoholic beverage has impaired or is likely to

impair the employee's job performance in the judgment of Contractor or Boise's Representative.  Contractor shall remove from the Site any of its employees who violate this policy.

Contractor shall not permit its employees to manufacture, distribute, dispense, sell, possess, or use illegal drugs or to use improperly other drugs on the Site.  Contractor shall not permit any of its employees to report to work on the Site while under the influence of any drug that could adversely affect performance.  Contractor shall remove from the Site any of Contractor's employees who violate this policy.

Contractor's employees who are under a physician's care and who are taking prescribed controlled substances that could affect performance must report this treatment to Contractor's Superintendent.

Boise reserves the right to inspect, with or without notice, all persons, packages, automobiles, and any other items that come onto or are brought onto the Site.  All desks, lockers, rooms, machines, and other items purchased by Boise remain the property of Boise, and Boise reserves the right to inspect them, including inspection using security dogs, with or without notice.

26.2   Drug and Alcohol Testing.  With respect to those employees working on the Site, Contractor will maintain and enforce its drug- and alcohol-testing policy which is attached as Schedule 5.0.  All personnel provided by Contractor under this Agreement to work on the Site will be subject to drug and alcohol testing pursuant to Contractor's Drug- and Alcohol-Testing Policy.  Contractor shall remove from the Site any of Contractor's personnel who test positive for drugs or alcohol under this policy.

27.0   COMPLIANCE WITH LAWS.

Contractor shall, in its performance of this Agreement, comply with all applicable federal, state, and local statutes, rules of law, ordinances, regulations, and regulatory orders, including but not limited to the federal Fair Labor Standards Act of 1938, as amended, and the notification and reporting requirements of the federal Emergency Planning and Community Right-to-Know Act of 1986.  Unless provided otherwise elsewhere in this Agreement, Contractor shall obtain all permits and licenses required for the performance of the Work.  In the case of construction of new facilities or remodeling of existing facilities, Contractor's Work shall comply with the Americans With Disabilities Act and regulations promulgated thereunder.  Further, Contractor shall comply with any existing state or federal regulations that will impose more stringent construction requirements to accommodate the disabled.

28.0   ASBESTOS REMOVAL.

If the Work specifically includes the removal of asbestos or asbestos-containing materials, Contractor, in its performance of the Work, agrees to comply with all existing laws, ordinances, and regulations of the United States and of any state, county, township, or municipal subdivision thereof, or other governmental agency which may be applicable to the removal, storage, labeling, transport, and disposal of asbestos material

("acts and regulations"), including but not limited to Section 112 of the Federal Clean Air Act, and accompanying regulations; and the Worker Safety Requirements of the Federal Occupational Safety and Health Act ("OSHA"), and accompanying regulations. For the purposes of this Section 28.0, it is agreed and understood that the Work performed by Contractor pursuant to this Agreement shall be deemed of sufficient magnitude to require compliance with reporting and other requirements established for renovation or demolition involving aggregate square footage of asbestos material greater than 260 square feet of pipe or 160 square feet of ducts, boilers, tanks, reactors, turbines, furnaces, or structural members.  Contractor shall provide appropriate protective clothing and respirator apparatus to workers, transport contaminated clothing in the manner specified by applicable acts and regulations, post caution signs as prescribed by applicable acts and regulations, use tools equipped with local ventilation systems, water soak asbestos insulation before removal, place removed asbestos insulation in double-walled air-tight bags, store bags containing removed asbestos insulation in impermeable containers labeled in accordance with requirements of applicable acts and regulations, store such containers in a secure area of the Work site isolated from elements that might cause damage to the containers and/or coverings, and comply with or adhere to all other statutory and regulatory requirements or prohibitions.  Contractor shall, on an ongoing basis, perform all air testing and monitoring required by applicable acts and regulations, file all necessary notifications, and obtain all permits, licenses, and other forms of documentation required to comply with such acts and regulations, and compile and maintain all employee exposure records, on-site monitoring records, and employee medical records required by the acts and regulations.  Contractor shall be obligated to fully comply with all acts and regulations whether or not specific requirements of said acts and regulations have been set forth herein.

If Contractor's air testing and monitoring outside the containment area at any time shows airborne asbestos concentrations in excess of 0.2 asbestos fibers longer than the five micrometers per cubic centimeter of air on an eight-hour time weighted average, Contractor shall immediately cease operation and notify Boise of such testing and monitoring results.  Contractor shall not continue with removal until it has demonstrated to Boise's satisfaction that Contractor has devised a removal program sufficient to reduce airborne asbestos concentration levels below those hereinbefore stated.

If any condition shall arise which endangers or threatens to endanger the safety of any person, the Work, or any property adjacent to the Work, Contractor shall immediately take all necessary steps to relieve such condition, including but not limited to stoppage of the Work where necessary.  Contractor's failure to comply with the requirements of this paragraph shall constitute a material breach of this Agreement.

29.0   SEVERABILITY.

Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

30.0   <u>MISCELLANEOUS</u>.

Captions or headings in the Contract Documents are for convenience only and in no way define, limit, or describe the scope or intent of any provisions or sections.  The parties agree and acknowledge that any liquidated damages contained in this Agreement are reasonable in light of the anticipated harm that would ensue, the difficulties in ascertaining and proving the resultant loss and damage suffered by Boise, and the inconvenience or nonfeasibility of otherwise obtaining an adequate remedy.

WHEREFORE, the parties have caused this Agreement to be executed on the date first set forth above.

ELITE SPECIALTY WELDING, LLC

By _____

Title _Bart Maple - President_____

BOISE PACKAGING & NEWSPRINT, L.L.C.

By _____

Title _PROCUREMENT MANAGER_____

SCHEDULE 1.0

<u>LABOR RATE SCHEDULE</u>

See attached



**Elite Specialty Welding**

Elite Industrial Services
Elite Specialty Welding, LLC
Time & Material Labor Rates

PCA (Paper Machine #3)

Expires 12/31/14

| Craft | ST | OT |
|---|---|---|
| MANAGEMENT | | |
| Project Manger | $83.73 | $107.93 |
| Lead Planner | $67.20 | $83.94 |
| Planner | $59.73 | $82.29 |
| Project Engineer | $67.20 | $92.57 |
| QC Manager | $71.08 | $96.46 |
| QC Inspector Specialty | $59.73 | $105.30 |
| Safety Manager | $59.73 | $82.29 |
| Office Manger | $43.31 | $59.66 |
| Timekeeper | $35.84 | $49.37 |
| Clerk | $29.87 | $41.14 |

| Craft | ST | OT |
|---|---|---|
| SUPPORT GROUP | | |
| Tool Room Attendant | $30.00 | $40.15 |
| Holewatch/Firewatch | $30.00 | $40.15 |
| Equipment Operator | $50.00 | $66.91 |
| Laborer | $26.66 | $35.69 |
| Laborer Foreman | $39.16 | $52.41 |

| Craft | ST | OT |
|---|---|---|
| MECHANICAL / PIPING | | |
| Piping Superintendent | $79.01 | $104.38 |
| Piping General Foreman | $58.33 | $78.06 |
| Piping Foreman | $56.66 | $75.83 |
| Piping Welder AA | $56.66 | $75.83 |
| Piping Welder A | $53.33 | $71.37 |
| Structural Welder | $46.66 | $62.45 |
| Piping Fitter AA | $53.33 | $71.37 |
| Piping Fitter A | $50.00 | $66.91 |
| Mechanical AA | $46.66 | $62.45 |
| Mechanical A | $43.33 | $57.99 |
| Piping Helper | $33.33 | $44.61 |
| Composite Shop Labor | $66.80 | $85.97 |

Markups:

| | | |
|---|---|---|
| Materials: | 10% |
| Subcontractors: | 10% |
| 3rd Party Rentals: | 10% |

\* Rates include wages, taxes, contributions or assessments for unemployment insurance, automobile liability, benefits,
small tools, PPE, company owned trucks, overhead and profit.

\*\* Craft per diem for personnel with permeant residence greater than 60 miles from work location will be paid a per diem of
$75 / day.  This cost will be invoiced as actual cost with no markup.

\*\*\* Mgmt per diem for personnel with permeant residence greater than 60 miles from work locaion will be paid a per diem of
$90 / day.  This cost will be invoiced as actual cost with no markup.

\*\*\*\*Fuel for 3rd party rentals is reimbursable

\*\*\*\*\*Consumables (rod, stick and purge gas are billable)

## EST RATE SCHEDULE

| Staff/Craft Description & Classification | Hourly Wage Shift | Hourly Wage | Vacation/Holiday | Taxable Wage D+H+V | Fica $/Hr | Fica & SUI % of G | Workers Compensation Insurance $/Hr | Workers Comp % on ST line | General Liability Insurance $/Hr | % on ST line | Training $/Hr | % on ST line | PPE $/Hr | % on ST Line | Small Tools $/Hr | % on ST Line | Fab Burden Cost | Medical | Overhead and Profit % Rate | Per Diem $/Day |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **MANAGEMENT** | | | | | | | | | | | | | | | | | | | | |
| Project Manager | ST | $50.00 | | | | 5.50% | | 4.00% | | 2.10% | | 1.50% | | 3.00% | | 7.25% | | | 15.00% | $90.00 |
|  | OT | $75.00 | | | | 5.50% | | 4.00% | | 2.10% | | 1.50% | | 3.00% | | 7.25% | | | 15.00% | $90.00 |
|  | OT | $75.00 | | | | 5.30% | | 4.00% | | 2.10% | | 1.50% | | 3.00% | | | | | 15.00% | $90.00 |
| Lead Planner | ST | $50.00 | | | | 5.50% | | 4.00% | | 2.10% | | 1.50% | | 3.00% | | | | | 15.00% | $90.00 |
|  | OT | $40.00 | | | | 5.30% | | 4.00% | | 2.10% | | 1.50% | | 3.00% | | | | | 15.00% | $90.00 |
| Planner | ST | $60.00 | | | | 5.50% | | 4.00% | | 2.10% | | 1.50% | | 3.00% | | | | | 15.00% | $90.00 |
|  | OT | $45.00 | | | | 5.30% | | 4.00% | | 2.10% | | 1.50% | | 3.00% | | | | | 15.00% | $75.00 |
| Project Engineer | ST | $45.00 | | | | 5.50% | | 4.00% | | 2.10% | | 1.50% | | 3.00% | | 7.25% | | | 15.00% | $90.00 |
|  | OT | $57.50 | | | | 5.30% | | 4.00% | | 2.10% | | 1.50% | | 3.00% | | 7.25% | | | 15.00% | $90.00 |
| QC Manager | ST | $40.00 | | | | 5.50% | | 4.00% | | 2.10% | | 1.50% | | 3.00% | | | | | 15.00% | $75.00 |
|  | OT | $60.00 | | | | 5.30% | | 4.00% | | 2.10% | | 1.50% | | 3.00% | | | | | 15.00% | $90.00 |
| QC Inspector Specialty | ST | $60.00 | | | | 5.50% | | 4.00% | | 2.10% | | 1.50% | | 3.00% | | | | | 15.00% | $90.00 |
|  | OT | $45.00 | | | | 5.30% | | 4.00% | | 2.10% | | 1.50% | | 3.00% | | | | | 15.00% | $90.00 |
| Safety Manager | ST | $60.00 | | | | 5.50% | | 4.00% | | 2.10% | | 1.50% | | 3.00% | | | | | 15.00% | $90.00 |
|  | OT | $43.50 | | | | 5.30% | | 4.00% | | 2.10% | | 1.50% | | 3.00% | | | | | 15.00% | $75.00 |
| Office Manager | ST | $30.00 | | | | 5.50% | | 4.00% | | 2.10% | | 1.50% | | 3.00% | | | | | 15.00% | $75.00 |
|  | OT | $30.00 | | | | 5.30% | | 4.00% | | 2.10% | | 1.50% | | 3.00% | | | | | 15.00% | $75.00 |
| Timekeeper | ST | $20.00 | | | | 5.50% | | 4.80% | | 2.10% | | 1.50% | | 3.00% | | | | | 15.00% | $75.00 |
|  | OT | $30.00 | | | | 5.30% | | 4.80% | | 2.10% | | 1.50% | | 3.00% | | | | | 15.00% | $75.00 |
| Clerk | ST | $20.00 | | | | 5.50% | | 4.80% | | 2.10% | | 1.50% | | 3.00% | | | | | 15.00% | $75.00 |
|  | OT | $30.00 | | | | 5.30% | | 4.80% | | 2.10% | | 1.50% | | 3.00% | | | | | 15.00% | $75.00 |
| **MECHANICAL/PIPING** | | | | | | | | | | | | | | | | | | | | |
| Piping Superintendent | ST | $45.00 | | | | 7.65% | | 4.80% | | 2.10% | | 1.50% | | 3.00% | | 17.25% | | | 8.00% | $75.00 |
|  | OT | $67.50 | | | | 7.65% | | 4.80% | | 2.10% | | 1.50% | | 3.00% | | 17.25% | | | 8.00% | $75.00 |
| Piping General Foreman | ST | $35.00 | | | | 7.65% | | 4.80% | | 2.10% | | 1.50% | | 3.00% | | 10.00% | | | 8.00% | $75.00 |
|  | OT | $52.50 | | | | 7.65% | | 4.80% | | 2.10% | | 1.50% | | 3.00% | | 10.00% | | | 8.00% | $75.00 |
| Pipe Foreman | ST | $51.00 | | | | 7.65% | | 4.85% | | 2.10% | | 1.50% | | 3.00% | | 10.00% | | | 8.00% | $75.00 |
|  | OT | $34.00 | | | | 7.65% | | 4.85% | | 2.10% | | 1.50% | | 3.00% | | 10.00% | | | 8.00% | $75.00 |
| Piping Welder AA | ST | $51.00 | | | | 7.65% | | 4.85% | | 2.10% | | 1.50% | | 3.00% | | 10.00% | | | 8.00% | $75.00 |
|  | OT | $33.00 | | | | 7.65% | | 4.85% | | 2.10% | | 1.50% | | 3.00% | | 10.00% | | | 8.00% | $75.00 |
| Piping Welder A | ST | $38.50 | | | | 7.65% | | 4.85% | | 2.10% | | 1.50% | | 3.00% | | 10.00% | | | 8.00% | $75.00 |
|  | OT | $42.00 | | | | 7.65% | | 4.85% | | 2.10% | | 1.50% | | 3.00% | | 10.00% | | | 8.00% | $75.00 |
| Structural Welder | ST | $30.00 | | | | 7.65% | | 4.85% | | 2.10% | | 1.50% | | 3.00% | | 10.00% | | | 8.00% | $75.00 |
|  | OT | $52.00 | | | | 7.65% | | 4.85% | | 2.10% | | 1.50% | | 3.00% | | 10.00% | | | 8.00% | $75.00 |
| Piping Fitter AA | ST | $51.00 | | | | 7.65% | | 4.85% | | 2.10% | | 1.50% | | 3.00% | | 10.00% | | | 8.00% | $75.00 |
|  | OT | $30.00 | | | | 7.65% | | 4.85% | | 2.10% | | 1.50% | | 3.00% | | 10.00% | | | 8.00% | $75.00 |
| Pipes Fitter A | ST | $15.00 | | | | 7.65% | | 4.95% | | 2.10% | | 1.50% | | 3.00% | | 10.00% | | | 8.00% | $75.00 |
|  | OT | $28.00 | | | | 7.65% | | 4.95% | | 2.10% | | 1.50% | | 3.00% | | 10.00% | | | 8.00% | $75.00 |
| Mechanical AA | ST | $40.00 | | | | 7.65% | | 4.85% | | 2.10% | | 1.50% | | 3.00% | | 10.00% | | | 8.00% | $75.00 |
|  | OT | $33.00 | | | | 7.65% | | 4.85% | | 2.10% | | 1.50% | | 3.00% | | 10.00% | | | 8.00% | $75.00 |
| Mechanical A | ST | $20.00 | | | | 7.65% | | 4.80% | | 2.10% | | 1.50% | | 3.00% | | 10.00% | | | 8.00% | $75.00 |
|  | OT | $30.00 | | | | 7.65% | | 4.80% | | 2.10% | | 1.50% | | 3.00% | | 10.00% | | | 8.00% | $75.00 |
| Pipe Helper | ST | $20.00 | | | | 7.65% | | 4.80% | | 2.10% | | 1.50% | | 3.00% | | 10.00% | | | 8.00% | $75.00 |
|  | OT | $40.00 | | | | 7.65% | | 4.80% | | 2.10% | | 1.50% | | 3.00% | | 10.00% | | | 8.00% | $75.00 |
| **SUPPORT GROUP** | | | | | | | | | | | | | | | | | | | | |
| Tool Room Attendant | ST | $18.00 | | | | 7.65% | | 4.80% | | 2.10% | | 1.50% | | 3.00% | | 10.00% | | | 8.00% | $75.00 |
|  | OT | $27.00 | | | | 7.65% | | 4.80% | | 2.10% | | 1.50% | | 3.00% | | 10.00% | | | 8.00% | $75.00 |
| Helper/Fire/watch | ST | $18.00 | | | | 7.65% | | 4.80% | | 2.10% | | 1.50% | | 3.00% | | 10.00% | | | 8.00% | $50.00 |
|  | OT | $22.00 | | | | 7.65% | | 4.80% | | 2.10% | | 1.50% | | 3.00% | | 10.00% | | | 8.00% | $75.00 |
| Laborer | ST | $16.00 | | | | 7.65% | | 4.80% | | 2.10% | | 1.50% | | 3.00% | | 10.00% | | | 8.00% | $75.00 |
|  | OT | $24.00 | | | | 7.65% | | 4.80% | | 2.10% | | 1.50% | | 3.00% | | 10.00% | | | 8.00% | $75.00 |
| Laborer Foreman | ST | $23.50 | | | | 7.65% | | 4.80% | | 2.10% | | 1.50% | | 3.00% | | 10.00% | | | 8.00% | $75.00 |
|  | OT | $35.25 | | | | 7.65% | | 4.80% | | 2.10% | | 1.50% | | 3.00% | | 10.00% | | | 8.00% | $75.00 |
| Equipment Operator | ST | $48.00 | | | | 7.65% | | 4.80% | | 2.10% | | 1.50% | | 3.00% | | 10.00% | | | 8.00% | $75.00 |
|  | OT | $34.00 | | | | 7.65% | | 4.80% | | 2.10% | | 1.50% | | 3.00% | | 10.00% | | 22.00% | 8.00% | $75.00 |
| Concrete Shop Labor | ST | $51.00 | | | | 7.65% | | 4.80% | | 2.10% | | 1.50% | | 3.00% | | 10.00% | | | 8.00% | $75.00 |

SCHEDULE 2.0

<u>OTHER CHARGES</u>

Not applicable

A.     CAD/CAM Rates.

B.     Reproduction Rates.

SCHEDULE 3.0

<u>FORM OF LIEN WAIVER</u>

1.  Partial Release of Lien

2.  Final Release of Lien

PARTIAL
RELEASE, WAIVER OF LIEN, AND ACKNOWLEDGMENT OF PAYMENT

BOISE PACKAGING & NEWSPRINT, L.L.C.
Project No. _____
Contract No. _____

_____ (name of individual signing waiver) attests as follows:

That he/she is a duly authorized representative of _____ (name of business), which has supplied goods and/or services to BOISE PACKAGING & NEWSPRINT, L.L.C. for the _____ (name of project) at _____ (location of project), and that he/she is duly authorized to make this partial release, waiver of lien, and affidavit of payment.

With full knowledge of any and all rights to claim a lien, statutory or otherwise, and in consideration of the sum of $_____, the receipt of which is hereby acknowledged, the undersigned does hereby irrevocably waive all claims of lien and right of lien against the above-referenced property for labor or material, or both, furnished through _____ (date).

The undersigned warrants that all cost for labor, material, and subcontract work has been paid covering all work performed to date by _____ (name of business) for the _____ (name of project).

_____

By _____
Title _____

STATE OF _____ )
                              ) ss.
COUNTY OF _____ )

       This instrument was acknowledged before me on _____, 2014, by _____ [name(s) of person(s)] as _____ [type of authority, e.g., officer, trustee, etc.] of _____ [name of party on behalf of whom instrument was executed].

 

                                            _____
                                            [Signature of notarial officer]

                                            [Seal, if any]

                                            _____
                                            Title [and Rank]
                                            My commission expires _____

FINAL
RELEASE, WAIVER OF LIEN, AND ACKNOWLEDGMENT OF PAYMENT

BOISE PACKAGING & NEWSPRINT, L.L.C.
Project No. _____
Contract No. _____

_____ (name of individual signing waiver) attests as follows:

That he/she is a duly authorized representative of _____ (name of business), which has supplied goods and/or services to BOISE PACKAGING & NEWSPRINT, L.L.C. for the _____ (name of project) at _____ (location of project), and that he/she is duly authorized to make this final release, waiver of lien, and affidavit of payment.

With full knowledge of any and all rights to claim a lien, statutory or otherwise, and in consideration of the sum of $_____ (total contract amount paid), the receipt of which is hereby acknowledged, the undersigned does hereby irrevocably waive all claims of lien and right of lien against the above-referenced property for labor or material, or both, furnished through _____ (date).

The undersigned warrants that all cost for labor, material, and subcontract work has been paid covering all work to be provided by _____ (name of business) for the _____ (name of project).

_____

By _____
Title _____

{BZ Legal/299004/0015:01260862:}ELITE – ANNUAL (2)

STATE OF _____ )
                                           ) ss.
COUNTY OF _____ )

      This instrument was acknowledged before me on _____, 2014, by
_____ [name(s) of person(s)] as _____
[type of authority, e.g., officer, trustee, etc.] of _____
[name of party on behalf of whom instrument was executed].


                _____
                [Signature of notarial officer]

                [Seal, if any]

                _____
                Title [and Rank]
                My commission expires _____

SCHEDULE 4.0

<u>EEO CERTIFICATE</u>

See attached

**Boise Paper Holdings, L.L.C.**

P.O. Box 990050
Boise, Idaho 83799-0050

## CERTIFICATE OF COMPLIANCE

Boise Paper Holdings, L.L.C., or subsidiaries thereof, is a contractor and subcontractor with the U.S. Government subject to the requirements of the executive orders and laws of the Federal Government for its contractors and subcontractors. Pursuant to the requirements of the orders and laws, our subcontracts for the furnishing of supplies and services must set forth certain obligations pertaining to nondiscrimination in employment.

We request that, as one of Boise Paper Holdings, L.L.C.'s subcontractors or suppliers under contracts or purchase orders that may be subject to these executive orders and laws, you sign and return the enclosed postcard certifying that you are in compliance with this Certificate of Compliance and return it within 30 days of the date of the enclosed cover letter. When received by Boise, the provisions of this certificate will be applicable to all current contracts and/or purchase orders for a period of one year or until performance is complete under any contract executed or purchase order issued within said year, whichever is longer.

## EQUAL OPPORTUNITY CLAUSE

(Applicable to all nonexempt individual contracts and annual purchases of $10,000 or more.)

During the performance of this contract, the Contractor agrees as follows:

(a)     The Contractor will not discriminate against any employee or applicant for employment because of age, race, color, religion, sex, national origin, physical or mental disability (where the applicant or employee can perform the essential functions of the job with or without reasonable accommodation and provision of the accommodation would not be an undue hardship), special disabled veterans, and veterans of the Vietnam era. The Contractor will take affirmative action to ensure that applicants are employed and that employees are treated during employment without regard to their age, race, color, religion, sex, national origin, physical or mental disability (as described above), special disabled veteran status, or Vietnam era veterans status. Such action shall include, but not be limited to, the following: employment upgrading, demotion or transfer, recruitment, advertising, layoff or termination, rates of pay or other forms of compensation, and selection for training, including apprenticeship. The Contractor agrees to post in conspicuous places, available to employees and applicants for employment, notices to be provided by the Contracting Officer setting forth the provisions of this nondiscrimination clause.

(b)     The Contractor will, in all solicitations or advertisements for employees placed by or on behalf of the Contractor, state that all qualified applicants will receive consideration for employment without regard to age, race, color, religion, sex, national origin, physical or mental disability (as described above), special disabled veteran status, or Vietnam era veteran status.

(c)     The Contractor will send to each labor union or representative of workers with which he has a collective bargaining agreement or other contract or understanding a notice to be provided by the agency Contracting Officer, advising the labor union workers' representative of the Contractor's commitments under this nondiscrimination clause, and shall post copies of the notice in conspicuous places available to employees and applicants for employment.

(d)     The Contractor will comply with all provisions of Executive Order No. 11246 of September 24, 1965, and of the rules, regulations, and relevant orders of the Secretary of Labor.

(e)     The Contractor will furnish all information and reports required by Executive Order No. 11246 of September 24, 1965, and by the rules, regulations, and orders of the Secretary of Labor, or pursuant thereto, and will permit access to his books, records, and accounts by the contracting agency and the Secretary of Labor for purposes of investigation to ascertain compliance with such rules, regulations, and orders.

(f)     In the event of Contractor's noncompliance with the nondiscrimination clause of this contract or with any of such rules, regulations, or orders, this contract may be canceled, terminated, or suspended in whole or in part, and the Contractor may be declared ineligible for further Government contracts in accordance with procedures authorized in Executive Order No. 11246 of September 24, 1965, and such other sanctions may be imposed and remedies invoked as provided in the said Executive Order or by rule, regulation, or order of the Secretary of Labor or as otherwise provided by law.

(g)     The Contractor will include the provisions of paragraphs (a) through (g) in every subcontract or purchase order unless exempted by rules or orders of the Secretary of Labor issued pursuant to Section 204 of Executive Order No. 11246 of September 24, 1965, so that such provisions will be binding upon each subcontractor or vendor. The Contractor will take such action with respect to any subcontract or purchase order as may be directed by the Secretary of Labor as a means of enforcing such provisions, including sanctions for noncompliance; provided, however, that in the event the Contractor becomes involved in, or is threatened with, litigation with a subcontractor or vendor as a result of such direction, the Contractor may request the United States to enter into such litigation to protect the interests of the United States.

Contractor agrees that if the amount of this contract is $50,000 or more and he employs 50 or more persons, it shall:

(a)     File with the Office of Federal Contract Compliance Programs or an agency designated by it, a complete and accurate report on Standard Form 100 (EEO-1) within 30 days after receiving an award of this contract (unless such report has been filed in the last 12 months), and continue to file such reports annually on or before March 31.

(b)     Develop and maintain a written affirmative action compliance program for each of its establishments in accordance with the regulations of the Secretary of Labor promulgated under Executive Order No. 11246 as amended.

## NONSEGREGATED FACILITIES

(Applicable to all nonexempt individual contracts and/or annual purchases of $10,000 or more.)

The Contractor certifies that it does not maintain or provide for its employees any segregated facilities at any of its establishments, and that it does not permit its employees to perform their services at any location under its control where segregated facilities are maintained. It certifies further that it will not maintain or provide for its employees any segregated facilities at any of its establishments, and that it will not permit its employees to perform their services at any location under its control where segregated facilities are maintained. The Contractor agrees that a breach of this certification is a violation of the Equal Opportunity Clause in this certificate. As used in this certification, the term "segregated facilities" means any waiting rooms, work areas, restrooms and washrooms, restaurants and other eating areas, time clocks, locker rooms and storage or dressing areas, parking lots, drinking fountains, recreation or entertainment areas, transportation, and housing facilities provided for employees which are segregated by explicit directive or are in fact segregated on the basis of race, creed, color, or national origin, because of habit, local custom, or otherwise. It further agrees that (except where it has obtained identical certifications from proposed subcontractors for specific time periods) it will obtain identical certification from proposed subcontractors prior to the award of subcontracts exceeding $10,000, which are not exempt from the provisions of the Equal Opportunity Clause, that it will retain such certifications in its files, and that it will forward the following notice to such subcontractors (except where the proposed subcontractors have submitted identical certifications for specific time periods):

## NOTICE TO PROSPECTIVE SUBCONTRACTORS OF REQUIREMENT FOR CERTIFICATION OF NONSEGREGATED FACILITIES

A certification of Nonsegregated facilities, as required by Section 60-1.8 of Title 41 of the Code of Federal Regulations, must be submitted prior to the award of a subcontract exceeding $10,000 which is not exempt from the provisions of the Equal Opportunity Clause. The certification may be submitted either for each subcontract or for all subcontracts during a period (i.e., quarterly, semi-annually, or annually). NOTE: The penalty for making false statements in offers is prescribed in 18 U.S.C. § 1001.

## AFFIRMATIVE ACTION FOR DISABLED WORKERS

(Applicable to all nonexempt individual contracts and/or annual purchases of $2,500 or more.)

The Contractor agrees to comply with all requirements of the Rehabilitation Act of 1973, as amended, and of the regulations promulgated pursuant thereto, including, without limitation, those regulations related to the preparation and maintenance of an affirmative action program for disabled individuals. The Affirmative Action for Disabled Workers Clause set forth in 41 C.F.R. § 60-741.4 is hereby incorporated herein by reference.

## AFFIRMATIVE ACTION FOR DISABLED VETERANS AND VETERANS OF THE VIETNAM ERA

(Applicable to all nonexempt contracts and/or annual purchases of $10,000 or more.)

The Contractor agrees to comply with all requirements of the Vietnam Era Veterans Readjustment Assistance Act of 1972, as amended, and of the regulations promulgated pursuant thereto, including, without limitation, those regulations relating to the preparation and maintenance of an affirmative action program for disabled veterans and veterans of the Vietnam era. The Affirmative Action for Disabled Veterans and Veterans of the Vietnam Era clause set forth in 41 C.F.R. § 60-250.4 is hereby incorporated herein by reference.

Boise Paper Holdings, L.L.C.

P.O. Box 990050
Boise, Idaho 83799-0050

## UTILIZATION OF SMALL BUSINESS AND SMALL DISADVANTAGED BUSINESS CONCERNS

### Part A

(Applicable to contracts of $10,000 or more.)

(a)      It is the policy of the United States that small business concerns and small business concerns owned and controlled by socially and economically disadvantaged individuals shall have the maximum practicable opportunity to participate in the performance of contracts let by any Federal agency.

(b)      The Contractor hereby agrees to carry out this policy in the awarding of subcontracts to the fullest extent consistent with the efficient performance of this contract.  The Contractor further agrees to cooperate in any studies or surveys as may be conducted by the Small Business Administration or the contracting agency which may be necessary to determine the extent of the Contractor's compliance with this clause.

(c)      (1)      As used in this contract, the term "small business concern" shall mean a small business as defined pursuant to Section 3 of the Small Business Act and relevant regulations promulgated pursuant thereto.

(2)      The term "small business concern owned and controlled by socially and economically disadvantaged individuals" shall mean a small business concern:

(i)      which is at least 51 per centum owned by one or more socially and economically disadvantaged individuals; or in the case of any publicly owned business, at least 51 per centum of the stock of which is owned by one or more socially and economically disadvantaged individuals; and

(ii)      whose management and daily business operations are controlled by one or more of such individuals.

The Contractor shall presume that socially and economically disadvantaged individuals include Black Americans, Hispanic Americans, Native Americans, Asian-Pacific Americans, and other minorities, or any other individual found to be disadvantaged by the Small Business Administration pursuant to Section 8(a) of the Small Business Act.

(d)      Contractors acting in good faith may rely on written representations by their subcontractors regarding their status as a small business concern or a small business concern owned and controlled by socially and economically disadvantaged individuals.

### Part B

### SUBCONTRACTING PLAN

(Applicable to contracts which exceed $500,000, or in the case of contracts for construction of any public facility, $1,000,000.)

(a)      This provision does not apply to small business concerns.

(b)      The term "subcontract" means any agreement (other than one involving an employer-employee relationship) entered into by a Federal Government prime contractor or subcontractor calling for supplies or services required for the performance of the original contract or subcontract.

(c)      The Contractor agrees to establish and conduct a program which will enable small business concerns and small disadvantaged business concerns (as defined in the Utilization Clause) to be considered fairly as subcontractors and suppliers under this contract.  In this connection, the Contractor shall:

1.      Submit a subcontracting plan to include percentage goals (expressed in terms of percentage of total planned subcontracting dollars) for the utilization as subcontractors of small and disadvantaged business concerns.

As part of its establishment of percentage goals, the subcontracting plan shall also include:

1.      A statement of (a) total dollars planned to be subcontracted; (b) total dollars planned to be subcontracted to small business concerns; and (c) total dollars planned to be subcontracted to small disadvantaged business concerns.

2.      A description of the principal product and service areas to be subcontracted and identification of areas to be used for small business and small disadvantaged business subcontractors.

3.      A statement of the method used in developing proposed subcontracting goals.

(d)      The Contractor agrees to designate a liaison officer who will administer the Contractor's small and small disadvantaged program and to submit a description of his or her duties.

(e)      The Contractor agrees to provide a description of efforts to be taken to assure that small and small disadvantaged business concerns will have an equitable opportunity to compete for subcontracts.

(f)      The Contractor shall include the Utilization Clause in all contracts which offer further subcontracting opportunities and shall require subcontractors (except small business firms) which receive subcontracts in excess of $500,000 (public facility -- $1,000,000) to adopt and comply with a plan similar to the plan agreed to by the Contractor.

(g)      The Contractor shall provide assurances that it will submit required periodic reports and cooperate in required studies and surveys.

(h)      The Contractor agrees to supply a recitation of records that it will maintain to demonstrate procedures which have been adopted to comply with the requirements and goals set forth in the plan.

## UTILIZATION OF WOMEN-OWNED BUSINESS CONCERNS

### Part A

(The following clause shall be included in all contracts expected to exceed $10,000, except (i) contracts which, including all subcontracts thereunder, are to be performed entirely outside the United States, its possessions, Puerto Rico and the Trust Territory of the Pacific Islands, and (ii) contracts for services which are personal in nature.)

(a)      It is the policy of the United States Government that women-owned business shall have the maximum practicable opportunity to participate in the performance of contracts awarded by a Federal agency.

(b)      The Contractor agrees to use its best efforts to carry out this policy in the award of subcontracts to the fullest extent consistent with the efficient performance of this contract.  As used in this contract, a "women-owned business" concern means a business that is at least 51% owned by a woman or women who also control and operate it.  "Control" in this context means exercising the power to make policy decisions.  "Operate" in this context means being actively involved in the day-to-day management.  "Women" means all women business owners.

### Part B

(The following clause shall be included in all contracts, amendments, or modifications expected to exceed $500,000 (public facility -- $1,000,000) which require the Utilization Clause.)

(a)      The Contractor agrees to establish and conduct a program which will enable women-owned business concerns to be considered fairly as subcontractors and suppliers under this contract.  In this connection, the Contractor shall:

(1)      Designate a liaison officer who will administer the Contractor's "Women-Owned Business Concerns Program."

(2)      Provide adequate and timely consideration of the potentialities of known women-owned business concerns in all "make-or-buy" decisions.

(3)      Develop a list of qualified bidders that are women-owned businesses and assure that known women-owned business concerns have an equitable opportunity to compete for subcontracts, particularly by making information on forthcoming opportunities available, by arranging solicitations, time for the preparation of bids, quantities, specifications, and delivery schedules so as to facilitate the participation of women-owned business concerns.

(4)      Maintain records showing (i) procedures which have been adopted to comply with the policies set forth in this clause, including the establishment of a source list of women-owned business concerns; (ii) awards to women-owned businesses on the source list by minority and nonminority women-owned business concerns; and (iii) specific efforts to identify and award contracts to women-owned business concerns.

(5)      Include the "Utilization of Women-Owned Business Concerns" clause in subcontracts which offer substantial opportunities.

**Boise Paper Holdings, L.L.C.**

P.O. Box 990050
Boise, Idaho 83799-0050

(6)   Cooperate in any studies and surveys of the Contractor's women-owned business concerns procedures and practices that the Contracting Officer may from time to time conduct.

(7)   Submit periodic reports of subcontracting to women-owned business concerns with respect to the records referred to in subparagraph (4) above, in such form and manner and at such time (not more often than quarterly) as the Contracting Officer may prescribe.

(b)   The Contractor further agrees to insert, in any subcontract hereunder which may exceed $500,000 (or $1,000,000 in the case of contract for constructing of any public facility) and which offers substantial subcontracting possibilities, provisions which shall conform substantially to the language of the clause, in Part A, including the paragraph (b), and to notify the Contracting Officer of the names of such subcontractors.

(c)   The Contractor further agrees to require written certification by its subcontractors that they are bona fide women-owned and controlled business concerns in accordance with the definition of a women-owned business concern as set forth in Part A, including the Utilization Clause (b) above at the time of submissions of bids or proposals.

## CLEAN AIR AND WATER

(Applicable to all nonexempt contracts and subcontracts which exceed $100,000, or which are for an indefinite quantity where there is reason to believe that the amount ordered in any one year will exceed $100,000, or where a facility to be used has been the subject of a conviction under the Clean Air Act (42 U.S.C. § 7413(c)(1)) or the Federal Water Pollution Control Act (33 U.S.C. § 1319(c)) and is listed by the Environmental Protection Agency, or the contract is not otherwise exempt.)

(a)   The Contractor agrees as follows:

(1)   To comply with all the requirements of Section 114 of the Clean Air Act (42 U.S.C. § 7401, et seq., as last amended by P.L. 101-549, 1990), and Section 308 of the Federal Water Pollution Control Act (33 U.S.C. § 1251, et seq., as amended by P.L. 92-500), respectively relating to inspection, monitoring, entry, reports, and information, as well as other requirements specified in Section 114 and Section 308 of the Air Act and the Water Act, respectively, and all regulations and guidelines issued thereunder before the award of this contract;

(2)   That no portion of the work required by this contract will be performed in a facility listed on the Environmental Protection Agency List of Violating Facilities on the date when this contract was awarded unless and until the EPA eliminates the name of such facility or facilities from such listing;

(3)   To use its best efforts to comply with clean air standards and clean water standards at the facilities in which the contract is being performed; and

(4)   To insert the substance of the provisions of this clause in any nonexempt subcontract, including this subparagraph (4).

(b)   The terms used in this clause have the following meanings:

(1)   "Standards" means any enforceable rules, regulations, guidelines, standards, limitations, orders, controls, prohibitions, implementation plans or procedures, or other requirements which are contained in, issued under, or otherwise adopted pursuant to the Clean Air Act, the Federal Water Pollution Control Act, or Executive Order No. 11738.

(2)   The term "facility" means any building, plant, installation, structure, mine, vessel, or other floating craft, location, or sites of operations, owned, leased, or supervised by the Contractor or subcontractor, to be utilized in the performance of a contract or subcontracts. Where a location or site of operations contains or includes more than one building, plant, installation, or structure, the entire location or site shall be deemed to be a facility except where the Director, Office of Federal Activities, Environmental Protection Agency, determines that independent facilities are co-located in one geographical area.

## ANTI-KICKBACK ACT

Contractor certifies, to the best of its knowledge and belief, that it has not offered, provided, solicited, or received any Kickbacks, or included, directly or indirectly, the amount of any Kickback in a contract price in violation of the Anti-Kickback Act of 1986.

Contractor warrants that it is in full compliance with the provisions of the Anti-Kickback Act of 1986, 41 U.S.C. §§ 51-58, and shall hold Boise harmless from any monetary loss Boise may suffer resulting from failure of such compliance.

The contract provision found in 48 C.F.R. § 52-203.7, "Anti-Kickback Procedures," of the Federal Acquisition Regulation is incorporated herein and made a part hereof as required by subparagraph (6) thereof.

SCHEDULE 5.0

<u>CONTRACTOR'S DRUG- AND ALCOHOL-TESTING POLICY</u>

See attached

## DRUG- AND ALCOHOL-TESTING POLICY

**A.**     The Company maintains a program of drug and alcohol screening for all new hires at all sites.   The Program requires that notice be given to job applicants indicating that screening will be conducted as a condition of employment.   If the applicant refuses to consent to the screening, the applicant will be denied employment.

**B.**     Pre-employment screening will consist of urine and/or blood tests conducted in accordance with procedures established at the construction site.  A certified laboratory using EMIT testing will be designated to screen urine and/or blood samples.  Laboratory procedures will emphasize accuracy and confidentiality of screen results.

**C.**     If the situation requires immediate and/or continued employment, the employee may be conditionally assigned to work pending results of the drug and alcohol screen with the understanding that failure to pass such screen will terminate such employment.   The employee shall be notified of these requirements.

**D.**     In the event that a drug and alcohol screen is positive, the person will be confidentially notified of the results and informed that a positive test precludes employment and/or continued employment at the present time.

   **1.**     At the discretion of management, re-screening will be performed immediately after the date of the last positive drug or alcohol screen (no later than three (3) consecutive days after notification).

   **2.**     A split sample may be used when positives are obtained.

   **3.**     A person who satisfactorily completes a follow-up screening may be considered for employment and/or continued employment based on skills and job availability.

**E.**     The employee will be responsible for the cost of the second screening.  If the second screen results are negative, the Company will reimburse the employee for the cost associated with the screening.

## RANDOM DRUG & ALCOHOL SCREENING

**A.**  The intent of random drug and alcohol screening is to help enforce the Substance Abuse Program.  When utilized, the selection of employees for random screening can be based on a computerized selection process.

**B.**     For a new project that will be subject to random testing, the Company will notify site employees at the start of the project, that random testing will be utilized.   If it is an ongoing project site that has not previously utilized random testing, The Company will provide 30 days notice to the employees at the project site before starting random testing. After the initial notification, employees may be chosen for random testing at any time.

**C.**     If random testing is utilized at a jobsite, the Company will include a minimum of twenty-five (25%) of the affected jobsite workers and the random testing will occur at least twice a year.

**D.**     The employee will provide urine and/or blood samples and screening will be done in accordance with procedures established for pre-employment screening. A split sample will be used as an option when positives are obtained.

E.     The employee will be asked to submit a urine and/or blood sample.  A refusal to submit to screening is, in fact, a failure to cooperate with a current and uniformly enforced Company program, and can result in termination.

F.     Employees having a positive urine and/or blood sample as confirmed by an independent laboratory shall be terminated.  The testing procedure for drug-related impairment shall use the EMIT or similar screening test.

## EMPLOYEE CONFIDENTIALITY

A.     Information generated in connection with drug and alcohol screening is inherently sensitive and will be treated in a confidential manner.  Care will be taken to:

1.     Conduct all testing and investigations as privately as is practical.

2.     Limit the number of management personnel involved in such tests and investigations.

3.     Instruct management personnel not to communicate confidential information about the results of tests to persons not authorized to receive this information.

4.     Keep test results separate from personnel files.

## NOTIFICATION

A.     Prior to implementation of the Program, each affected location will assure that the employees are aware of the current Substance Abuse Program and screening procedures:

1.     A notice will be posted on bulletin boards and other conspicuous locations at the work site for employee notification.2.  Warning signs about the Program will be posted at all entrances to the premises.

2.     Where drug and alcohol screening is to be performed, all new employees will be informed of the Program and will be required to sign a statement acknowledging they have been notified of the Program and that they understand its content.

## ELIGIBILITY FOR REHIRE

A.     Unless a collective bargaining agreement for a particular employee provides otherwise, any employee terminated for violating this policy shall be designated "not for rehire."

B.     If a specific project site also has a drug policy and there is a conflict between the two policies, the more stringent provision of the two policies will be applied to employees working on the project site.

# EXHIBIT B-2

## AGREEMENT OF MERGER

## AGREEMENT OF MERGER

THIS AGREEMENT OF MERGER (the "Agreement"), dated June 20, 2017, is entered into by and between Boise Packaging & Newsprint, L.L.C., a Delaware limited liability company, having its principal office at 1955 W. Field Court, Lake Forest, IL  60045 ("BPN"), and Packaging Corporation of America, a Delaware corporation ("PCA"). In consideration of the mutual promises and covenants contained in this Agreement, the parties agree as follows:

WHEREAS, BPN is duly organized and existing under the laws of the State of Delaware;

WHEREAS, PCA is duly organized and existing under the laws of the State of Delaware;

WHEREAS, pursuant to Title 8, Section 264(c) of the General Corporation Law of the State of Delaware, and Title 6, Section 18-209 of the Limited Liability Company Act of the State of Delaware, all of which authorize the merger of a Delaware limited liability company with and into a Delaware corporation, BPN desires to merge with and into PCA (the "Merger") with PCA as the surviving entity;

WHEREAS, BPN's limited liability company agreement permits, and the sole member of BPN has approved and consented to, this Agreement and the consummation of the Merger; and

WHEREAS, PCA's certificate of incorporation and bylaws permits, and resolutions adopted by the board of directors authorize, this Agreement and the consummation of the Merger.

NOW THEREFORE, parties hereby agree as follows:

1.      **The Merger.**

1.1     <u>Surviving Entity</u>. On July 1, 2017 at 4:01 am EST (the "Effective Time"):

a)      BPN shall be merged with and into PCA in accordance with Title 8, Section 264(c) of the General Corporation Law of the State of Delaware, and Title 6, Section 18-209 of the Limited Liability Company Act of the State of Delaware,

b)      PCA shall be the surviving entity of the Merger (the "Surviving Entity") and shall continue to be governed by the applicable laws of the State of Delaware,

c)      The identity, existence, rights, privileges, powers, franchises, properties and assets of PCA shall continue unaffected and unimpaired by the Merger and shall be vested in the Surviving Entity, and



d)      The identity and separate existence of BPN shall cease, and all the rights, privileges, powers, franchises, properties and assets, both tangible and intangible, of BPN shall be assigned to and vested in the Surviving Entity.

1.2     <u>Bylaws; Certificate of Incorporation; Directors and Officers</u>. From and after the Effective Time until amended as provided by law, the bylaws and certificate of incorporation of PCA, as both are in effect immediately prior to the Effective Time, shall be the bylaws and certificate of incorporation of the Surviving Entity until thereafter amended in accordance with the General Corporation Law of the State of Delaware, and the directors and officers of PCA in office immediately prior to the Effective Time shall be the directors and officers of the Surviving Entity as of the Effective Time.

1.3     <u>Ownership Conversion</u>. At the Effective Time, all of the common units of BPN outstanding immediately prior to the Effective Time shall, by virtue of the Merger and without any additional action on the part of PCA or BPN, be canceled; and all of the common stock of PCA, as the Surviving Entity, shall continue to remain outstanding.

2.     **General**

2.1     <u>Condition to the Merger</u>. The Merger shall have been duly authorized by both PCA and BPN prior to the filing of the Certificate(s) of Merger (or equivalent filing(s)) with the Secretary of State of the State of Delaware. The Secretary of PCA certifies that this Agreement has been adopted by PCA pursuant to the first sentence of subsection (f) of Section 251 of the General Corporation Law of the State of Delaware and that the conditions specified in such sentence have been satisfied.

2.2     <u>Termination</u>.  Notwithstanding anything herein or elsewhere to the contrary, this Agreement may be terminated and the Merger may be abandoned at any time prior to the Effective Time by mutual written consent of PCA and BPN.  If this Agreement is terminated pursuant to this Section 2.2, this Agreement shall become void and of no effect with no liability on the part of either party hereto.

2.3     <u>Entire Agreement</u>. All prior or contemporaneous agreements, contracts, promises, representations, and statements, if any, between PCA and BPN, or their representatives, are merged into this Agreement, and this Agreement shall constitute the entire understanding among PCA and BPN with respect to the subject matter hereof.

2.4     <u>Governing Law</u>.  This Agreement shall be construed in accordance with and governed by the laws of the State of Delaware, without giving effect to principles of conflicts of law.

2.5     <u>Counterparts; Effectiveness</u>. This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument. This Agreement shall become effective

when each party hereto shall have received the counterpart hereof signed by the other party hereto.

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed by their respective officers or managers as of the day and year first written above.

PACKAGING CORPORATION OF AMERICA

By: _____

Name:  Kent A. Pflederer
Title:  Senior Vice President, General Counsel, and Secretary

BOISE PACKAGING & NEWSPRINT, L.L.C.

By: _____

Name: Kent Pflederer
Title:  Sole Manager

APPROVED BY:
BOISE PAPER HOLDINGS, L.L.C.
Sole Member of Boise Packaging & Newsprint, L.L.C.

By: _____

Name: Kent Pflederer
Title:  Sole Manager

-3-